CAROLINE PERRY, Appellant, v. MRS. P. W.
  STRAWBRIDGE and Mrs. J. A. THOMPSON,
  Appellants, and CALLIE EVANS et al., Respond-
  ents.

**Division One, February 26, 1908.**

1. **INHERITANCE: Through Murder of Intestate.** One who mur-
   ders an owner of property cannot inherit from such murdered
   person. Especially should that be the ruling where the murder-
   er has only a mere expectancy in his victim's property. So
   where George Evans murdered his wife, who died without child-
   ren or other descendants, and soon afterwards committed sui-
   cide, he did not inherit any interest in her property, and hence
   his children have no interest therein.

2. ———: **By Husband: Curtesy.** Under the Act of 1895 (Sec.
   2938, R. S. 1899) the husband cannot be denied the right to one-
   half his childless wife's property because he had no curtesy
   in her estate. The very purpose of that act was to make pro-
   vision for the husband in case he had no curtesy.

3. ———: **Profiting by Crime: Common Law: Part of Statute.**
   By the common law no one shall be permitted to acquire prop-
   erty by his own crime, and the common law is by statute made a
   part of the law of this State, unless repealed, changed or modi-
   fied by statute, and in this respect it has not, either expressly
   or impliedly, been repealed or modified by our Statute of Des-
   cents and Distributions. Hence, a husband who murders his
   childless wife cannot, under the act of 1895, inherit her proper-
   ty, nor can his children inherit her property through him.

4. ———: **Statutory Construction: In Light of Common Law: Act
   of 1895.** Statutes are not only read and construed in the light
   of the common law, but those in derogation of the common law
   are to be strictly construed, especially where they are in dero-
   gation of common right and common decency. The Widower's
   Dower Act of 1895 is not inconsistent with the common law
   which prohibited an heir from inheriting the property of an
   intestate whom he had murdered.

5. ———: ———: **Spirit and Meaning: Exception: Widower.** The
   courts will not give a construction to a statute which is abhor-
   rent to reason, but one in harmony with its reason and spirit.
   Though general in its terms and by its strict letter applicable
   to the case in suit, an exception will be made when to hold

it ) apply will be to shock a sense of decency and common right, and defeat the intention and high purpose of the statute itself. Hence, the word "widower" in the Act of 1895, providing that when the wife shall die without any child or other descendants, her widower shall be entitled to one-half of all her property absolutely, means one who has been reduced to that condition by the ordinary and usual vicissitudes of life, and not one who by his own criminal act has made himself a widower.

6. ———: **Murder: Forfeiture of Estate.** To hold that a murderer cannot inherit the property of his victim is not to violate the Bill of Rights which says that "no conviction can work corruption of blood or forfeiture of estate." In such case, the murderer acquired no estate in his victim's property.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

REVERSED AND REMANDED (*with directions*).

*Reed, Yates, Mastin & Harvey* for appellants.

(1) Section 2938, Revised Statutes 1899, was enacted as a companion statute to section 2939, Revised Statutes 1899, and the same rules of legal construction apply to both. Under section 2939 the wife takes in lieu of dower. Under section 2938 the husband takes in lieu of curtesy. Von Arb v. Thomas, 163 Mo. 33; Gilroy v. Brady, 195 Mo. 209; Spurlock v. Burnett, 183 Mo. 501; Matney v. Graham, 50 Mo. 559; Wigley v. Beauchamp, 51 Mo. 544; Hamilton v. O'Neil, 9 Mo. 11; Jarboe v. Hey, 122 Mo. 354; Payne v. Payne, 119 Mo. 174; Westerman v. S. L. K. of P., 196 Mo. 714. (2) A husband cannot take under section 2938 property of the wife whose death was occasioned by the criminal and felonious act of the husband himself. Wharton on Homicide (3 Ed.), p. 1064, sec. 665; Cleaver v. Life Asso., 1 Q. B. 147; Lundy v. Lundy, 24 Can. Sc. 650; Box v. Lanier, 112 Tenn. 393; Mutual Life Ins. Co. v. Armstrong 117 U. S. 591; Schreiner v. High Ct. C. O. of F., 35 Ill. App. 576; Schmidt v. Northern Life Asso., 112 Iowa 41; Riggs v. Palmer, 115 N. Y. 506, 5 L. R. A.

340; Shellenberger v. Ransom, 31 Neb. 61, 10 L. R. A. 810; McKinnon v. Lundy, 24 Ont. Rep. 132. (3) Statutes are to be read and construed in the light of the common law and with reference to its cognate principles. Johnson v. Fluetsch, 176 Mo. 452; Brown v. Dressler, 125 Mo. 589; State v. Clinton, 67 Mo. 380; Judson v. Smith, 104 Mo. 61; Rozzelle v. Harmon, 103 Mo. 339; Westerman v. K. of P., 196 Mo. 714. (4) Sections 2938 and 2939 are to be construed as one law, and as reciprocal statutes affecting the estates of husband and wife respectively in the same manner. Gilroy v. Brady, 195 Mo. 209; Spurlock v. Burnett, 183 Mo. 501; Waters v. Herboth, 178 Mo. 166. (5) Section 2938 of the statutes must be construed in accordance with the following settled rules: (a) Statutes are to be read and construed in the light of common law and with reference to its cognate principles. Among these principles is the maxim "No man can take advantage of his own wrong." (b) Statutes in derogation of the common law are to receive such construction as not to allow them to infringe upon the rules or principles of the common law to any greater extent than is plainly expressed. (c) Statutes should always be construed so as to give effect to the intention of the lawmakers; to ascertain this intention the court is not confined to the language of the act but should consider the evil it was designed to remedy, and it is competent for the court to declare that a thing which may be within the letter of the statute is not governed by the statute. The reason of the law should prevail over its letter. (d) If a literal interpretation of the statute will distort it from its true purpose, or lead to unjust, oppressive or absurd results, the presumption is that the Legislature intended an exception to its language, and this is true where there is neither obscurity or anything equivocal in the language of the law itself. 1 Kent's Com., p. 464; Burt v. Ins. Co., 187 U. S. 362; Ins. Co. v. Arm-

strong, 117 U. S. 599; State v. Clinton, 67 Mo. 390; Judson v. Smith, 104 Mo. 61; Westerman v. K. of P., 196 Mo. 670; Ross v. Railroad, 111 Mo. 25; Venable v. Railroad, 112 Mo. 103; Chouteau v. Railroad, 112 Mo. 375; Bank v. Haywood, 62 Mo. App. 550; State ex rel. v. Railroad, 105 Mo. App. 207; Townsend v. Hawkins, 45 Mo. 288; Gupton v. Gupton, 47 Mo. 46; Sharkey v. McDermott, 91 Mo. 652; Nowack v. Berger, 133 Mo. 42; Church of the Holy Trinity v. U. S., 143 U. S. 457; Lau Ow Bew v. U. S., 144 U. S. 47; Rodgers v. U. .,, 152 Fed. 346; Sams v. Sams, 85 Ky. 396; Henry v. Tillson, 17 Vt. 486; Reygate v. Wardsboro, 30 Vt. 446; Ingraham v. Speed, 30 Miss. 410.

*Ben T. Hardin* and *Clyde Taylor* for respondents.

(1)    The right of the widower to take under section 2938 does not depend on the right of curtesy. Secs. 2938, 2941, R. S. 1899; Ferguson's Estate v. Gentry, 104 S. W. 108.    (2)    The court cannot write an exception into the plain words of section 2938, on the ground of public policy.    The statute itself is public policy.    Moorshead v. Railroad, 203 Mo. 121; Owens v. Owens, 100 N. C. 24; Deem v. Miliken, 53 Ohio St. 688; Shellenberger v. Ransom, 41 Neb. 631; Carpenters' Appeal, 170 Pa. St. 203; In re Johnson Estate, 29 Pa. Super. Ct. 255; McAllister v. Fair, 72 Kan. 533; Kuhn v. Kuhn, 125 Ia. 449.

*Barnett & Barnett* and *Bruce Barnett* also for respondents.

(1)    Under section 2938 the husband inherits one-half of his wife's estate where she dies without children even though the estate she left was one in which he had no interest as a tenant by the curtesy. The estate which the husband takes under this section is not an incident or dependent upon an estate by curtesy. The stat-

ute in question absolutely provides that if the wife dies without children or other descendants, the husband shall be entitled to one-half of her estate. Gilroy v. Brady, 195 Mo. 208; Obrien v. Ash, 169 Mo. 288; Waters v. Herboth, 178 Mo. 169; Richter v. Bohnsack, 144 Mo. 516; Spurlock v. Burnett, 183 Mo. 528. (2) Whatever the rule may have been at common law, under our statute and Constitution and under similar statutes and Constitutions in this country, the fact that the husband took the life of his wife does not change the statutory devolution of the wife's property and does not operate as a forfeiture of his inheritance. The statute establishes the rule of descent and distribution which is not affected by the criminal act of the heir or distributee. 21 Am. & Eng. Ency. Law (2 Ed.), 238 and 239; Shellenberger v. Ransom, 41 Neb. 631, 59 Neb. 935; Deem v. Millikin, 6 Ohio Circt. Ct. 357, affirmed 53 Ohio St. 668; Carpenter Estate, 170 Pa. St. 203; Owens v. Owens, 100 N. Car. 240; In re Johnson Estate, 29 Pa. Super. Ct. 225; In re Kuhn's Estate (Iowa), 101 N. W. 151; McAllister v. Fuir, 72 Kan. 533; King v. Ex'r of King, 64 Mo. App. 301. The authorities cited by appellant are not in point, most of the cases relied on being insurance cases or other cases, where plaintiff's cause of action is based upon the fraudulent abuse of contract right, and such cases have no analogy to a case in which the law itself casts the descent. Carpenter Estate, 170 Pa. St. 203. (3) But if we had a statute in this State forfeiting the inheritance of a homicide, should he take the life of the person from whom he otherwise would inherit, such statute would be unconstitutional. It is provided in our Constitution, "That no person can be attainted of treason or felony by the General Assembly; that no conviction can work corruption of blood or forfeiture of estate." Sec. 13, art. 2, Constitution of Missouri;

209 Sup—40

Carpenter's Estate, 170 Pa. St. 203; Deem v. Millikin, 6 Ohio Circt. Ct. 357, affirmed 53 Ohio St. 668; Owens v. Owens, 100 N. Car. 240; McAllister v. Fair, 84 Pac. 113.

GRAVES, J.—The petition is one for the partition of real estate in Jackson county, Missouri, formerly owned by Lillie Maud Evans, now deceased. Whilst a petition in partition, it admits that two defendants, Callie Evans and Zora Evans, claim an interest in the property, but avers that they have no interest. Two defendants, Mrs. P. W. Strawbridge and Mrs. J. A. Thompson, file answers, which in averments practically correspond with the petition of the plaintiff and likewise ask for partition. The defendants, Callie Evans and Zora Evans, by their separate answer, each aver that they are the children of George Evans, who was the husband of Lillie Maud Evans, and that the said Lillie Maud Evans died before their father and without children, by which fact their father inherited an undivided one-half interest in the property, which passed to them upon his subsequent death. These defendants prayed the court to ascertain and determine the title. Other defendants merely had undisputed mortgage rights. The case was tried upon the following agreed statement of facts:

"It is hereby agreed by the parties hereto, that upon the trial of this cause the following facts shall be taken as true: That on May 26th, 1902, one Henry Wollman was the absolute owner in fee simple of the land in the West Kansas Addition, number one, in plaintiff's petition described; that on said day Lillie Maud Evans became the owner of said property by virtue of a full warranty deed from the said Henry Wollman; that on June 4th, 1902, one James Clark Whittier was the absolute owner in fee simple of the land in Hyde Park in plaintiff's petition described,

and that on said last-named date Lilly Maud Evans
became the owner of said property by virtue of a full
warranty deed from said James Clark Whittier and
wife; that George Evans and the said Lilly Maud
Evans were lawfully married on the 12th day of Octo-
ber, 1898; that no child was ever born of said union;
that on August 15, 1903, said Lilly Maud Evans was
the owner of the above-described land by virtue of the
facts above set forth, and on said day was the lawful
wife of the said George Evans; that on said August
15, 1903, the said Lilly Maud Evans died by the hand
of her husband, the said George Evans, and that about
three hours thereafter the said George Evans died by
his own hand, all in Kansas City, Jackson county,
Missouri; that the said Lilly Maud Evans died without
any child or other lineal descendant in being capable
of inheriting; that at the time last aforesaid, the land
in Hyde Park in plaintiff's petition described, was en-
cumbered by a deed of trust given by the said Lilly
Maud Evans and her said husband to Benjamin F.
Wollman, trustee for Henry Wollman, on September
19, 1902, to secure one principal note for $1,500, due
three years after date, and six interest notes for $45
each; that at said time the land in the West Kansas
Addition, number one, in plaintiff's petition described,
was encumbered by a deed of trust given by the said
Lilly Maud Evans and her said husband to Benjamin
F. Wollman, trustee for Henry Wollman, on June 18,
1902, to secure three principal notes payable — —
years from date, two of said notes being for $1,000
each, and the remaining one for $2,000, together with
twelve interest notes for $30 each and six for $60 each.

"It is hereby further agreed that the said Lilly
Maud Evans was killed by the said George Evans
without lawful provocation or excuse; that the said
Lilly Maud Evans left surviving her, as her only next
of kin, two sisters, Mrs. P. W. Strawbridge and Mrs. J.

A. Thompson, and her mother, Caroline Perry, who are the only legal heirs except as to such rights of inheritance, if any, as might under the circumstances aforesaid, or as may be shown on the trial in addition thereto, have accrued to her husband, the said George Evans; that the said George Evans left surviving him, as his sole heirs at law, two children by a former wife, Callie Evans and Zora Lee Evans; that Edie Evans is the legal guardian of the person and estate of the said Zora Lee Evans, a minor."

The court ascertained and decreed title and ascertained the rights and interests of the mortgagee. This decree vested an undivided one-sixth interest in the plaintiff and an undivided one-sixth interest in each of the defendants, Mrs. Strawbridge and Mrs. Thompson. It also vested an undivided one-fourth interest in each of the defendants, Callie and Zora Evans.

After unsuccessful motions for new trial and in arrest of judgment, the defendants, Mrs. Strawbridge and Mrs. Thompson, and the plaintiff appealed.

The only question is as to what construction shall be placed upon section 2938, Revised Statutes 1899, in a case involving the admitted facts herein disclosed.

This is an exceedingly interesting case. The question for determination, bluntly stated, is, Can a husband who murders his wife inherit the one-half part of her estate under section 2938, Revised Statutes 1899? To this State it is a new question, and, with few exceptions, a new one in all the States. But few courts of last resort have been called upon to pass upon the question as to what effect the criminal act of a prospective legal heir will have upon his or her rights, under positive statutes governing descents and distributions. Of those which have passed upon it, we frankly confess that the holdings of a majority thereof are against the views which we entertain and will hereafter express. We are not satisfied with the reasoning

of those cases and have been unable to reach the conclusion that a mere prospective legal heir, or devisee in a will, can make certain that which was uncertain, by his own felonious act, in the cold-blooded murder of the party from whom he or she expects to inherit. We do not believe that these courts have fully applied and used the canons of statutory construction which we have the right to use and ought to use to avoid a result so repugnant to common right and common decency. The construction as has been given such statutes bruises and wounds the finer sensibilities of every man. In the case at bar, the murdered woman, younger in years, might have outlived the prospective heir. The property involved in this very suit might have been used by her for her own comforts even though she had died first. Being hers it might have been sold and the proceeds disposed of by gift or otherwise. Can it be said that one, by high-handed murder, can not only make himself an heir in fact, when he had but a mere expectancy before, but further shall enjoy the fruits of his own crime? To us this seems abhorrent to all reason, and reason is the better element of the law. With these preliminary remarks, we will now dispose of the several contentions involved here, as well as assign our reasons for the views we entertain upon the main proposition.

I. It is suggested in one of the briefs for respondents that the appellants have failed to file a sufficient abstract of the record and we take it for that reason they would have us affirm the judgment. We have examined the record carefully and conclude that it is sufficient to meet the requirements of the law and the rules of the court. It is also urged that there is no separate assignment of errors in the brief as required by Rule 15 of this court and for that reason there is a failure to comply with the rules. The same question was before us and fully discussed in Collier v.

Catherine Lead Co., 208 Mo. 246, where we held contrary to the contention of respondents here. This leaves for our consideration only the merits of the case.

II. It is earnestly pressed by counsel that under section 2938, Revised Statutes 1899, the husband cannot take unless he would have been entitled to curtesy. They contend that sections 2938 and 2939 are companion sections and inasmuch as we have held under the latter that the wife cannot take unless she was entitled to dower, we should hold that the husband cannot take unless he was entitled to curtesy. We have no doubt said that these are companion sections and in a way they are, and we have also said that the purpose of the Act of 1895, now section 2938, was to equalize the rights of husband and wife in their respective estates, but it does not follow from this that the husband must have a curtesy estate before he can take under section 2938, supra. Prior to the Act of 1895, if a childless wife died leaving an estate, however large, the husband not being entitled to curtesy, got nothing. But if a childless husband died prior to this time, the wife got one-half absolutely, subject only to the debts. It is true that by section 2938 she was given a dower interest, but by section 2941 she is given the right to elect as to how she will take. To our mind the Act of 1895 was for the very purpose of making provision for a husband in the event he was not entitled to curtesy. [Ferguson Estate v. Gentry, 206 Mo. 203, and Ferguson v. Gentry, 206 Mo. 189, and cases therein cited.]

This contention of appellants is not sustained.

III. Of our present Statute of Descents and Distributions, the first five sections, 2908 to 2913 inclusive, had their origin in the Territorial Laws of 1807. Sections 2913, 2915, 2916, 2917 and 2918 had their origin in the Act of 1822. Section 2914 had its origin in 1855,

and the remaining two sections, 2919 and 2920, had their origin in Acts of 1864-5. Our dower section 2933 originated with the Act of 1807, supra, and section 2941, giving the widow of a childless husband one-half of the property, first came to light in 1835.

The section of our statute, Revised Statutes 1899, section 4151, which adopted the common law in Missouri, was first enacted January 18, 1816. Of the Act of 1807, adopted prior to the adoption of the common law, LEONARD, J., in the case of Cutter v. Waddingham, 22 Mo. l. c. 261, said: "The Act of 1807 was the first American law of descents introduced here; it superseded the Spanish law of succession, and was a complete scheme, which provided for the whole subject and left nothing to be supplied by any other code. It was the work of men familiar with the common law and strangers to the Roman law, and was no doubt adopted by our Territorial lawgivers from the written laws of the older States of the Union, and not constructed here with any special reference to the existing law of this country."

These original laws of descents and even our present statutes were borrowed largely from the common law. They are with some modifications expressive of the common law. In other words the general scope of our laws of descent and distribution is along the line of the common law, and this is true in most of the American states.

Bingham in the preface to his work, "The Laws of Descent," says: "The laws of descent were an organic part of the feudal system; and, so far as the general principle of succession is involved, have come down to us unchanged. Important alterations have been made in the order and lines of succession. The course of descent has also been subjected to be entirely defeated by the alienation of the ancestor while alive, and by his testamentary alienation to take effect at and

after his death.  His estate has also been made liable to the payment of his debts, and the fulfillment of his personal obligations, after the succession of the heir. Otherwise, the heir succeeds the ancestor in the ownership of the estate, precisely as he did under the feudal law, in all the States of this country; that is, his right of succession is based upon the same principle, which regulated succession under purely feudal organizations." [See, also, 14 Cyc. p. 24.]

In Missouri we began to modify in favor of the wife by the Act of 1835, when we gave her half when the husband died childless.  Later we have the several Married Woman's Acts giving to her peculiar rights in both personal and real property.  The husband up to 1895 had been holding his common law rights, shorn down, by the acts aforesaid, when for the first time, by the Act of 1895 aforesaid, the wife dying childless, he was made an heir to one-half of her estate absolutely.  We have in ways changed the lines of descent, both as to the husband and other heirs at law, and have changed the quantum of the estate which descends to each, but with it all, our laws are yet expressive of the common law in the matter of descent and distribution in a large degree.

When we took unto ourselves the common law, as we did in 1816, and in later reiterations of that statute, we took the body of all the common law, which could be made applicable under our constitutions, State and Federal, and such is the law of the State except where repealed, changed or modified by statute.

In the case of Box v. Lanier, 112 Tenn. l. c. 409, the Supreme Court of Tennessee said: "It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts.  Among these are: 'No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his

own iniquity, or to acquire property by his own crime.
These maxims are adopted by public policy, and have
their foundation in universal law administered in all
civilized countries.' These maxims embodied in the
common law, and constituting an essential part of its
warp and woof, are found announced both in text-books
and in reported cases. Without their recognition and
enforcement by the courts their judgments would ex-
cite the indignation of all right-thinking people. The
first of these maxims is applied in order to prevent
one from taking the benefit of his own fraud. Why
should not the last be enforced so as to forbid a party
receiving the fruits of his own crime?"

And EARL, J., for the New York Court of last re-
sort, in Riggs v. Palmer, 115 N. Y. l. c. 511, said: "Be-
sides, all laws as well as all contracts may be controlled
in their operation and effect by general, fundamental
maxims of the common law. No one shall be permitted
to profit by his own fraud, or to take advantage of his
own wrong, or to found any claim upon his own in-
iquity, *or to acquire property by his own crime.* These
maxims are dictated by public policy, have their foun-
dation in universal law administered in all civilized
countries, and have nowhere been superseded by stat-
utes." Farther on in the same opinion he says:
"These maxims without any statute giving them force
or operation, frequently control the effect and nullify
the language of wills. A will procured by fraud and
deception, like any other instrument, may be decreed
void and set aside, and so a particular portion of a will
may be excluded from probate or held inoperative if
induced by the fraud or undue influence of the person
in whose favor it is. [Allen v. McPherson, 1 H. L. Cas.
191; Harrison's Appeal, 48 Conn. 202.] So a will may
contain provisions which are immoral, irreligious or
against public policy, and they will be held void.

"Here there was no certainty that this murderer

would survive the testator, or that the testator would not change his will, and there was no certainty that he would get this property if nature was allowed to take its course. He, therefore, murdered the testator expressly to vest himself with an estate. Under such circumstances, what law, human or divine, will allow him to take the estate and enjoy the fruits of his crime? The will spoke and became operative at the death of the testator. He caused that death and thus by his crime made it speak and have operation. Shall it speak and operate in his favor? If he had met the testator and taken his property by force, he would have had no title to it. Shall he acquire title by murdering him? If he had gone to the testator's house and by force compelled him, or by fraud or undue influence had induced him to will him his property, the law would not allow him to hold it. But can he give effect and operation to a will by murder, and yet take the property? To answer these questions in the affirmative, it seems to me, would be a reproach to the jurisprudence of our State, and an offense against public policy.

"Under the civil law evolved from the general principles of natural law and justice by many generations of jurisconsults, philosophers and statesmen, one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered. [Domat, part 2, book 1, tit. 1, par. 3; Code Napoleon, par. 727; Mackeldey's Roman Law, 530, 550.] In the Civil Code of Lower Canada the provisions on the subject in the Code Napoleon have been substantially copied. But so far as I can find, in no country where the common law prevails had it been deemed important to enact a law to provide for such a case. Our revisers and lawmakers were familiar with the civil law, and they did not deem it important to incorporate into our statutes its provisions upon this subject. This is not a *casus*

*omissus.*  It was evidently supposed that the maxims of the common law were sufficient to regulate such a case and that a specific enactment for that purpose was not needed."

These maxims of the common law are expressly made a part of our laws by the statute of this State, first adopted in 1816, as we have hereinabove indicated. They are a part of the law of the State by force of section 4151, Revised Statutes 1899, unless they have been repealed, changed, modified or wiped out by statute law.  Have we by statute either expressly or impliedly changed or modified the maxims discussed in the Tennessee and New York cases, supra?  Has the common law in this respect been repealed, changed or modified?  We think not.  If not, they are a part of our law.  If not, then this statute must be read in connection therewith, and when so read the father of appellees acquired no interest in the estate in controversy and appellees have none.  "Statutes in derogation of the common law are to be strictly construed, unless as in some states there is a statutory provision to the contrary."  [8 Cyc. 376, and cases cited.]

The common-law rule is tersely stated in section 665 of Wharton on Homicide (3 Ed.), thus: "To permit a person who commits a murder, or any person claiming under him, to benefit by his criminal act, would be contrary to public policy.  And no devisee can take under the will of a testator whose death has been caused by the criminal and felonious act of the devisee himself.  And in applying this rule, no distinction can be made between a death caused by murder and one caused by manslaughter.  Nor does the common-law right of succession by descent operate in favor of one who willfully takes the life of his ancestor for the purpose of succeeding to his property rights. And the common-law right of a man to succeed to the

property of his wife upon her death does not operate in favor of one who murders his wife. And the rule that the common-law doctrine of succession to property does not operate in favor of one who willfully takes the life of his ancestor should apply against any person claiming through or under the slayer. Nor does a rule of law that a common-law right of succession to property does not operate in favor of one who willfully takes the life of his ancestor contravene a constitutional provision that a conviction of crime shall not work a forfeiture of the estate.''

To our mind our Statute of Descents and Distributions is so largely expressive of the common law that we must consider these maxims and the whole body of the applicable common-law doctrines; that we must read them together as parts and parcels of the same system, and when so read there can be but one answer to the query suggested by the facts of this case.

For these considerations alone we think this case should be reversed, but we take up next a discussion of this statute.

IV.  But leaving out of consideration the conclusions above reached, i. e., that our statutes of descents and distributions, and the live parts of the common law, constitute one system of laws in this State upon that subject, and that the statutory law must be construed with reference to that live portion of the common law, and going to this statute itself, how shall we construe it?  Must we give a construction abhorrent to reason, or should we give it a construction in harmony with the reason and spirit of the law?  Shall we stick in the bark and adhere to the strict letter of the law, or shall we say that whilst the case may fall within the letter of the law, yet it does not fall within the spirit or reason, or within the reasonable legislative intent?  The courts in this State and elsewhere have not been remiss in finding rules of construction for statutes in

character such as the one before us.  The statute we
are called upon to construe, reads: "When a wife
shall die without any child or other descendants in
being capable of inheriting, her widower shall be enti-
tled to one-half of the real and personal estate belong-
ing to the wife at the time of her death, absolutely,
subject to the payment of the wife's debts."

Statutes should be read in the light of the com-
mon law, and this statute should be read in that light.
Chancellor KENT, 1 Kent's Commentaries (14 Ed.), p.
464, says: "Statutes are likewise to be construed in
reference to the principles of the common law; for it
must not be presumed that the Legislature intended
to make any innovation upon the common law, further
than the case absolutely required.  This has been the
language of the courts in every age; and when we con-
sider the constant, vehement, and exalted eulogy
which the ancient sages bestowed upon the common
law as the perfection of reason, and the best birthright
and noblest inheritance of the subject, we cannot be
surprised at the great sanction given to this rule of
construction."

In Black on Interpretation of Laws, page 233, it is
said: "No statute enters a field which was before en-
tirely unoccupied.  It either affirms, modifies or re-
peals some portion of the previously existing law.  In
order, therefore, to form a correct estimate of its scope
and effect, it is necessary to have a thorough under-
standing of the laws, both common and statutory,
which heretofore were applicable to the same subject.
Whether the statute affirms the rule of the common law
upon the same subject, or whether it supplements it,
supersedes it, or displaces it, the legislative enactment
must be construed with reference to the common law;
for in this way alone is it possible to reach a just ap-
preciation of its purpose and effect.  Again, the com-
mon law must be allowed to stand unaltered as far as

is consistent with a reasonable interpretation of the new law.''

Our statutes of descents and distributions, as we have seen, both affirm and modify the common law, but nowhere specifically mention that rule or doctrine of the common law which precluded the murderer from inheriting from his victim. This latter is not so inconsistent with the statute as to call upon us to say that such portion of the common law, previously existing, was repealed or changed by the Act of 1895.

Our own court adheres to the same rule in Johnson v. Fluetsch, 176 Mo. l. c. 468, where we said: ''Statutes are read and construed in the light of the common law. 'Rules of interpretation and construction are derived from the common law, and since that law constitutes the foundation and primarily the body and soul of our jurisprudence, every statutory enactment is construed by its light and with reference to its cognate principles. [Sutherland on Stat. Cons., sec. 289.]''

And statutes in derogation of the common law are to be strictly construed. [See Brown v. Dressler, 125 Mo. l. c. 593; State v. Clinton, 67 Mo. 380; Judson v. Smith, 104 Mo. 61; Rozelle v. Harmon, 103 Mo. 339.] And this is especially true where the statute is in derogation of common right and common decency, as well as the common law. The construction contended for by the appellees is one which shocks both common right and common decency, and no court should be inclined to other than a construction which would make the statute comport with reason and the fundamental maxims of the law.

It is true, strictly speaking, that the old idea of equitable construction of statutes is no longer recognized by the courts, but in speaking upon this point Mr. Black in his most excellent treatise entitled Interpretation of Laws, truthfully says: ''But nevertheless many

of the cases which were decided on what was called the 'equity of the statute' would now be decided in precisely the same way, though not avowedly on that principle. This is because there was a just and reasonable idea at the base of the principle in question, and this, so far as it is applicable to modern conditions, has survived. This idea was that a given case should not be taken to be within a statute, though apparently covered by its comprehensive terms, unless it is within the spirit and reason of the law.'' The same learned author at page 48 lays down this rule: ''A statute should be construed with reference to its spirit and reason; and the courts have power to declare that a case which falls within the letter of a statute is not governed by the statute, because it is not within the spirit and reason of the law and the plain intention of the Legislature.'' This rule finds support in case after case as we read them in the books.

The case of Sams, etc. v. Sams' Admr., 85 Ky. 396, is one of such cases. The facts were that Leroy Sams was lawfully married to a woman by whom he had four children. During the life of the first wife he was having illicit relations with another woman by whom he had two children. These were born one eight and the other ten years prior to the death of his wife. Upon the death of his wife he married the mother of these two children, who also had five others which had been born out of wedlock. Sams recognized these two as his children. In that State the statute provided, ''If a man having had a child by a woman shall afterwards marry her such child, or its descendants, if recognized by him before or after marriage, shall be deemed legitimate.'' Counsel in that case contended as do able counsel in this case. They said the statute makes no exception and the courts are powerless to make it, but Pryor, C. J., followed that rule of statutory construc-

tion which should be followed in all such cases. In an able opinion he says:

"It is insisted by counsel for the appellants that the meaning and intention of the statute is so plain that but one interpretation can be given it; and although the children were begotten by the intestate when he was the lawful husband of another, his adulterous practices with an unchaste woman, and unfaithfulness to his own wife and children, cannot be considered in determining the rights of those who were not participants in the wrong, and whose rights the statute was enacted to protect.

"If the case before us, or that class of cases where the husband has violated his marriage vows, and become the father of children by an adulterous sexual connection with another woman during the marital relation, had been the subject of legislative thought, it can scarcely be supposed that any law would have been enacted by which the children of the adulterous intercourse would be made legitimate, that they might inherit with the children of the lawful wife equal parts of his estate. Such a statute, if so construed, would only invite the husband to desert his wife, and the woman of easy virtue to encourage the violation of his marriage vows, that she might some day become his lawful wife and her children the rightful heirs of his estate. The motive to supplant the love of a true woman by the lewd practices of degraded women would be found in such a statute, and the law, instead of securing to the innocent offspring an interest in the estate of the father, and encouraging the latter to make reparation for the wrong committed by marrying the mother, would invite the commission of great moral wrong, and hold out an inducement to the guilty parties to remove those who stood in the way of legitimizing their children by the consummation of the contract of marriage. . . . It is a well-settled rule of con-

struction, that the letter of a statute will not be followed when it leads to an absurd conclusion; but, on the contrary, the reason for the enactment must enter into its interpretation, so as to determine what was intended to be accomplished by it."

If the courts can invoke this rule of construction to disparage and condemn adultery and its attendant evils, can't we invoke it to prevent the legal creation of an heir, and an estate for such heir, by murderous hands? Our statute is no more explicit in terms than the Kentucky statute. The language of the one is as broad as the other.

The Supreme Court of the United States has likewise dealt with the same rule of statutory construction in the case of Church of the Holy Trinity v. United States, 143 U. S. 457. This case construes the Federal Act of February 26th, 1885, which was, "To prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States," etc. The first section reads:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the passage of this act it shall be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners into the United States, its Territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its Territories, or the District of Columbia."

Plaintiff in error was a corporation and had made

a contract with an alien residing in England, one E. Walpole Warren, to come to New York and serve it in the capacity of a minister of the Gospel. There were exceptions in other portions of the act, but ministers were not included in these exceptions, so that the statute is, if anything, more absolute than is the statute under review here. It shows that the legislative mind in fact considered exceptions, whilst our statute does not so show. Mr. Justice BREWER, who wrote the opinion, says:

"It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on one side with compensation on the other. Not only are the general words labor and service both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind;' and, further, as noticed by the circuit judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers and domestic servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force to this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or the absurd results which follow from giving such broad meaning to the words.

makes it unreasonable to believe that the legislator intended to include the particular act."

To like effect are Lau Ow Bew v. U. S., 144 U. S. 47; Rodgers v. U. S., 152 Fed. 346; Henry v. Tilson, 17 Vt. 486; Ryegate v. Wardsboro, 30 Vt. 746; Ingraham v. Speed, 30 Miss. 410; Jackson v. Collins, 3 Cowen 89; People v. Utica Ins. Co., 15 Johns. 358; Ex parte Ellis, 11 Cal. 222; Osgood v. Breed, 12 Mass. 525; U. S. v. Kirby, 74 U. S. 482; Hanger v. Abbott, 73 U. S. 532; Braun v. Sauerwein, 77 U. S. 218. See, also, the numerous cases, both ancient and recent, discussed in Black on Interpretation of Laws, under his rule No. 29, pages 48 to 55, inclusive.

Nor has this rule of statutory construction failed of ample recognition by the courts of this State. Our Dower statute, section 2933, Revised Statutes 1899, provides that the widow has her dower in all lands of which her husband was seized during the marriage unless she has relinquished such dower "in the manner prescribed by law." This manner was by deed. Yet we have held under this statute that a deed to a railroad right of way signed by the husband alone, or condemnation proceedings against the husband alone, would prevent an action for dower by the widow. [Venable v. Railroad, 112 Mo. 103; Chouteau v. Railroad, 122 Mo. 375.] This statute does not say, "endowed in all lands *except such as has been conveyed or condemned for public purposes.*" Yet we have so construed the statute.

Our Statute of Frauds, section 3418, Revised Statutes 1899, reads: "No action shall be brought . . . . upon any contract made for the sale of lands . . . . or any lease thereof . . . . unless the agreement upon which the action shall be brought . . . . shall be in writing and signed by the party to be charged therewith." Yet, under the maxims of the common law, how many cases have we exempted from the strict

letter of the law.  Both Bench and Bar are so familiar with the case law under this section that citation thereof would be superfluous.

Again, in the very recent case of Keeney v. McVoy, 206 Mo. 42, a case with many more obstacles and difficulties, the identical rule of construction which we have announced was announced by this court In Banc, which decision puts the present case at rest—peacefully, justly and righteously.  The question there was the right of the widow to elect to take a child's part. Mrs. McVoy was the widow of Brice McVoy.  At the death of Brice McVoy he had no child living, and of course his widow had no "child or children by such husband living."  They did have a grandchild, the child of a deceased daughter, which daughter had departed life prior to the death of Brice McVoy.  The statute we were then called upon to construe reads: "When the husband shall die, leaving a child or children or other descendants, the widow, if she has a child or children by such husband living, may, in lieu of dower of the one-third part of all lands whereof her husband died or shall die seized of an estate of inheritance, to hold and enjoy during her natural life, elect to be endowed absolutely in a share of such lands equal to the share of a child of such deceased husband.  The provisions of this section shall be subject to the payment of her husband's debts."  [Sec. 2944, R. S. 1899.]

Lamm, J., after reviewing all the Missouri cases involving constructions of the character we have before us now, as well as many outside cases, concludes an exhaustive and elegant opinion in this language: "Other cases to like effect might be cited.  The Dower Act but supplements the Descents and Distributions Act.  They must be taken and construed together. Cases illuminating the one, throw light on the other, and based on the reasoning aforesaid, and in the light of the foregoing authorities, we have no difficulty or

hesitation in construing the word 'children' in section 2944, supra, to include grandchildren. Any other construction would lead to absurd and unjust results and be obviously without the legislative intent."

In Verdin v. St. Louis, 131 Mo. 1. c. 163, this court In Banc announced in explicit terms its approval of the rule of construction we have adopted in the case at bar. The language of that case is: "This view is sanctioned by abundant authorities which hold that the letter of a statute may be enlarged or restrained, according to the true intent of the framers of the law. [Whitney v. Whitney, 14 Mass. 92; State ex rel. v. Emerson, 39 Mo. 80; State ex rel. v. King, 44 Mo. 283; Riddick v. Walsh, 15 Mo. 519.] In such cases, the reason of the law prevails over its letter, and general terms are so limited in their application as not to lead to injustice, oppression, or an absurd consequence, the presumption being indulged that the Legislature intended no such anomalous results. [United States v. Kirby, 7 Wall. 482; People ex rel. v. McRoberts, 62 Ill. 38; Fusz v. Spaunhorst, 67 Mo. 256; Sutherland, Stat. Constr., p. 288.]"

In fact, the pathway of judicial literature from the earliest period down to the present is literally strewn with cases, which like beacon lights have guided the hand of justice in preventing unjust, unrighteous, absurd, unreasonable and abhorrent results from the use of general words and expressions in statutes. To cite and quote more would be but to become tedious. We have gone thus far on account of the newness of the particular question of this case. Under these authorities we should not and will not hold, that "widower" as used in section 2938, supra, means one who has created a condition by murderous hands and heart. This case is without the statute. "Widower" as there used means one who has been reduced to that condition by the ordinary and usual vicissitudes of life, and not

one who, by felonious act, has himself created that condition.

V. Nor do we think that this construction violates section 13, article 2 of our Bill of Rights. That section says: "That no person can be attainted of treason or felony by the General Assembly; that no conviction can work corruption of blood or forfeiture of estate."

Suppose the Legislature had put in section 2938 the exception which appellees say the court can not read into the section, i. e., "her widower, except he be such by his own felonious act, shall be entitled," etc., then according to counsel's present contention the statute would be violative of the Bill of Rights. In other words we are damned if we do and likewise damned if we don't.

In the case of Box v. Lanier, supra, the court said: "The provision in question is that 'no conviction shall work corruption of blood or forfeiture of estate.' This provision has no connection whatever with the devolution of property, but it is intended in its last clause to prevent a forfeiture of an estate of a criminal on account of his offense; but we hold that, under the facts found in this record, the surviving husband never acquired an estate in this property, and therefore there was nothing upon which this constitutional provision could operate."

We concur in these tersely expressed views. This construction of the existing statute, or even an express statute, as they have in Iowa, prohibiting a murderer from inheriting from his victim does not violate our constitutional provision. There is no forfeiture of an estate which he has, but it is simply preventing him from acquiring property in an unauthorized and unlawful way, i. e., by murder. It takes nothing from him, but simply says you cannot acquire property in this way. Nor does such a statute prevent his heirs

from inheriting through him property rightfully his at the time of his demise. The state cannot by law take a criminal's property, but it can say to every individual citizen you cannot acquire property by designated unlawful means. Such statutes violate no constitutional provisions, either State or Federal.

As we stated in the outset, our views are not in harmony with a majority of the adjudicated cases. We were convinced of the righteousness of the views expressed by the courts of New York and Tennessee, and the first opinion by COBB, C. J., in a Nebraska case, which was later decided to the contrary by RYAN, Commissioner. In opposition to these cases are cases from Pennsylvania, Ohio, North Carolina, Iowa and Kansas.

A discussion of the opinions in these cases would serve no good purpose. To our mind the reason is against them, and they have not given full weight to the rule of statutory construction so often and so recently recognized and enforced by this court. Nor do they give that weight to the maxims of the common law, which in our humble judgment should be given in determining a case involving this particular question.

From these views it follows that the judgment herein should be reversed and this cause remanded to the circuit court with directions to enter a judgment and decree vesting the property in dispute in the plaintiff, and the defendants Mrs. P. W. Strawbridge and Mrs. J. A. Thompson, subject to the mortgage rights of the defendant Wollman, and which said judgment and decree should further adjudge and decree that defendants Callie Evans and Zora Evans have no title or interest in said property. Cause reversed and remanded with the directions aforesaid.

All concur.