GRAVES, J.
— This is an action by the collector of Clay county by which it is sought to collect from defendant certain State, county, school and other taxes alleged to be due upon personal property owned or held by defendant. "Defendant filed answer, the necessary portions of which will be noted as required in the course of the opinion.
Plaintiff offered in evidence the back taxbill and rested the case. .Defendant then offered an agreed statement of facts as follows:
“In the trial of the above entitled cause it is hereby agreed between the parties plaintiff and defendant that the following facts are true, reserving, however, to each party the right to object to the introduction of any one or all of such agreed facts on the ground of its or tbeir irrelevancy, inadmissibility .or incompetency, to-wit:
“1. That defendant is an educational corporation duly organized under and by virtue of an act of the General Assembly of the State of Missouri, approved *? February 27, 1849, entitled ‘An Act to Charter a College in the State of Missouri,’ found in the Laws of Missouri of the year 1849, passed by the 15th General Assembly of said State, at page 232, 233 and 234.
“2. That said defendant acquired its name, to-wit, ‘Trustees of William Jewell College,’ and its college, ‘William Jewell College,’ was located in the town, now city, of Liberty, in Clay county, Missouri, on August 21, 1849, and a certificate, showing said name and location, was filed in the office of the recorder of deeds for Clay county, Missouri, on August 25, 1849, in accordance with the provisions of said act approved February 27,1849.'
“3. At the date of the passage of the act which defendant claims exempts it from taxation,, to-wit, February 22, 1851, defendant had no endowment in personal property. The endowment at that date, possessed by defendant, consisted solely of the real estate mentioned in said Act of February 22, 1851.
“4. That at and ever since said date of February 22, 1851, defendant accepted said act and has since, and is now engaged in the work of education and maintaining said college at Liberty in the State of Missouri. And all its property, real and personal was, and is now being used for that purpose exclusively, and not for. the purpose of private gain or emolument to the defendant, or any person or corporation.
‘‘5. That by the name ‘William Jewell College' in the title and first section of the Act of the General Assembly, approved February 22, 1851, found in the Laws of Missouri of the year 1851, at pages 64 and 65-, is meant said defendant, ‘The Trustees of William Jewell College.’
“6. That said defendant has since February 22, 1851, sold the lands mentioned in said act of that date except the land used as its college campus in Clay county, Missouri, and the proceeds -derived therefrom were turned into its general endowment fund. That *307 since that date and prior to the assessment of the taxes herein sued for, defendant has received its gifts and bequests of money for its educational endowment, and derived from the sale or proceeds of its real estate, personal property greater in amount than, the assessment on which the taxes sued for in this case are claimed to be levied, and that it had in its possession said personal property as a part of its endowment at the time of said assessment.
“7. The said defendant was not assessed for taxation after February 22, 1851, in Clay county, Missouri, until the assessment was made for the taxes sued for herein; nor has defendant paid any taxes on its said property, real or personal, since said date.
“8. That the various steps in levying said assessment for the taxes sued for herein, the returning of them to the county clerk, the extension of said taxes on the tax books, the delivery of said tax books to .the collector, and his endeavor to collect said taxes, are regular on their face and no objection is to be made thereto, except that the property of defendant is exempt from and not subject to taxation.”
Defendant also put in evidence the two acts of the General Assembly mentioned in the agreed statement of facts.
By oral evidence it was shown that the defendant had never been required to pay any taxes up to the time of this-suit, although it owned property in different parts of the State. It was also shown that the revenue officers of the State had always construed the Act of 1851 as exempting all of the college property from taxation.
The property sought to be taxed in the present case covers the endowment fund of the college. The trial court held that the property of defendant was exempted from taxation, and from its judgment the plaintiff brings the case here by appeal.
*308 I. The real question in this .case is the construction to he given to the Act of 1851, which is relied upon by the defendant as exempting it from the taxes sought to be recovered. Preliminary to a discussion of the statute itself, it is well to get our bearings upon the rules of construction applicable to a case of this character. It stands admitted that the property sought to be taxed is the endowment fund of the defendant. It stands admitted that defendant is an educational institution or corporation, and is not a corporation for gain or profit.
It is urged that exemption -statutes are to be strictly construed. Generally speaking, such is the rule. But we take it from the cases that there has been a well recognized exception to the rule. Perhaps a better wording would be to say that the courts have never been over anxious to apply the rule so as to impose burdens upon religious, scientific, literary and educational institutions. Strict construction has largely been applied to corporations organized for profit and gain, not to corporations performing a public service. As tending to show the drift of the courts, some of the cases may not be amiss.
In State v. Fisk University, 87 Tenn. 233, the Supreme Court of Tennessee says: “The contention on behalf of the State and county is that, inasmuch as the Constitution of 1870 requires all property to be taxed, with the exceptions therein stated, the exception and exemption must be strictly construed, and nothing not within the letter of the exception must be allowed to escape its share of the burdens of government. It is unnecessary to resort to argumentation, or to .cite authorities for the general principle that exemptions from taxation are generally to be construed with great strictness. Our reported cases state and maintain the rule as contended for, and this court has no purpose or disposition to depart from such construction. But this, like all other rules of construction, is made *309 to rest -upon the intention of the Legislature, and will not be allowed to defeat the will of the lawmaking branch of the government. To apply this strict .construction to individuals, and to corporations for profit, is but to announce the judgment of the courts upon the intention of the Legislature; while to give to a constitutional or legislative act, granting- an exemption in aid of institutions-literary and educational, a construction that is within the spirit, policy, and purpose of the act, and not opposed to its letter, is likewise but. ascertaining and declaring the intent of the lawmaking power.....We only decide that the intention of the Legislature must govern in ascertaining the -extent of such exemptions, and that in arriving at such intention the same strictness of construction will not be indulged where- the exemption is to religious, scientific, literary, and educational institutions, that will be applied in considering exemptions to corporations created and operating for private gain or profit.”
So, too, in Indiana, the Supreme Court of that State, after recognizing the general rule, in the case of City of Indianapolis v. Grand Master, 25 Ind. 518, said: “In favor of literary and scientific institutions possibly a more liberal construction would be required, for the reason that the encouragement, of educational facilities is in furtherance of a public policy deemed so vital to the success and permanence of free government, that it is prominently manifested in our Constitution and laws. ’ ’
In People ex rel. v. Tax Commissioners, 11 Hun, l. c. 506, it is said: “The'Revised Statutes provide that the real and personal property of every public library shall be exempt from taxation. [1 R. S. 388, see. 4, sub. 5.] The question is whether the relator is such a public library and entitled to the statutory exemption.. The question is not free from doubt. Statutory exemptions are, in general, strictly construed, and there is force in the contention that such exemption *310 should be limited to libraries organized and maintained by the State or its political subdivisions, or to such as are established by private liberality for the free use of the public, ‘and such use guaranteed by the charter of deed of foundation.’ There are, however, some persuasive considerations peculiar to the case at bar. The purposes of the relator are essentially of a public character. It exists neither directly nor indirectly for private, personal, or corporate gain, but for the encouragement and advancement of geographical science, and the collection, diffusion and perpetuation of useful knowledge. Such a public-spirited and beneficial institution is entitled to a broader and more liberal construction of the statute of exemptions, than if it were a mere money-making body. The spirit of the cases favors this conclusion; for, while in Chegaray v. The Mayor, 13 N. Y. 220, it was held that a private boarding school was not within the statute exempting ‘every school house and every building erected for the use of a college, incorporated academy, or other seminary of learning,’ yet in the Hebrew Free School Association v. The Mayor, 4 Hun, 446, a society organized under, the laws for the incorporation of benevolent, charitable, scientific, and missionary societies, was treated as a ‘religious society’ within an act (Laws 1852, chap. 282) limiting exemption from taxation to what is ‘exclusively’ the property of a ‘religious society.’ The object in the one case was private gain, and the construction was strict; in the other gratuitous instruction,, and the interpretation was liberal.”
An exemption statute was under discussion in L. & N. R. Co. v. Gaines, 3 Fed. 266. In that case, Baxter, C. J., said: “The office of a good expositor, says My Lord Coke, ‘is to make construction on, all its parts together. ’ The plainest words may be controlled by the context. It is the intention expressed in the act, as a whole, that is to prevail. Courts look to the centext, as well as to the words, for the meaning’ of particular *311 words used in the act. They may also take into consideration the purpose the Legislature was endeavoring to accomplish, acts in.pari materia, and contemporaneous surroundings. These rules of common sense, applied from time to time in the construction of statutes, shall guide us in this instance.”
At least it should be-said that the courts in, such cases -will not permit the evident intent of the legislative mind to be thwarted by its use of unfortunate words, when the intent can •be clearly gathered from the context of the act, when considered along with the attendant public policy and other surrounding circumstances. [Hale v. Stimson, 198 Mo. l. c. 165.]
The cardinal rule of construction is that which requires the legislative intent to be ascertained, and to this all other rules are subservient. With these observations we proceed to the real task allotted by the issue made in this case.
II. The Act of 1851 (Laws 1851, p. 64), reads:
“An Act for the benefit of William Jewell College.
“1. Certain lands owned by ‘William Jewell College’ exempted from tax.
“2. Delinquent lands relieved from payment of taxes; duties of Register of Lands.'
“3. Penalty for trespass on lands.
“4. This is a public act; duties of circuit court.

“Be it enacted, by the General Assembly of the State of Missouri, as folloivs:

“1. That all the land and improvements thereon now owned by the ‘William Jewell College’ in the counties of Clay, of Grundy, Mercer and Sullivan, and all the lands that may hereafter be granted or devised to said college, or any other institution of learning in this State, for the benefit of education, be, and the same are hereby exempted from all taxes and assessments so long as said lands may be owned by said college.
*312 “2. That the lands belonging to said college in the counties of Mercer and Sullivan which have been returned delinquent for non-payment of taxes, are hereby released from the same; and the Register of Lands is hereby authorized to grant an acquittance of the same to said college on payment of the office fees.
“3. That any person or persons, who shall willfully cut, injure, destroy or remove any timber or other •, materials, from, or on, any of the lands belonging to said college without the consent of the board of directors thereof, shall be guilty of a misdemeanor, and subject to be indicted and punished as in cases now .provided for by law.
“á. This act is hereby declared a public act, and shall be given in charge to the grand juries of the counties of Clay, Grundy, Mercer and Sullivan, at each term of the circuit court.
“This act to take effect.and be in force from and after its passage.
“Approved February 22,1851.”
The agreed statement of facts shows that at the time this act was passed the entire endowment fund of the defendant was in lands.
Defendant contends that the word “lands” as used in this exemption statute means that the endowment fund of the defendant was and is to be exempted from taxation. The plaintiff urges a strict construction and therefore claims that this term does not apply to any of the college endowment, except such as is in' fact invested in lands. Plaintiff also urges that there has been a repeal of the Act of 1851 by subsequent constitutional provisions. The latter contention we will consider, if necessary, in a further paragraph.
As bearing upon the suggestion made in our paragraph one, supra, in a well recognized authority on statutory construction (2 Lewis’s Sutherland, Stat. Constr., sec. 376), it is said: “The mere literal construction of a section in a statute ought not to prevail *? if it is opposed to the intention of the Legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. ‘While the intention of the Legislature must be ascertained from the words used to express it, the manifest reason and the obvious purpose of the law should not be sacrificed to a literal interpretation of such words.’ Words or clauses may be enlarged or restricted to effectuate the intention or to harmonize them with other expressed provisions. Where general language construed in a broad sense would lead to absurdity it may be restrained. The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense they were intended to be used as they are found in the act. The sense in which they were intended to be used furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning is to be given according to the intention thus indicated.”
And the same author at section 379, says: “A thing which is within the ob ject, spirit and the meaning of the statute is as much within the statute as- if it were within the letter. Conversely, a thing which is not within the intent and spirit of a statute is not within the statute, though within the letter.”
These rules this court has fully recognized. [Hale v. Stimson, 198 Mo. l. c. 165; Keeney v. McVoy, 206 Mo. 42, and Perry v. Strawbridge, 209 Mo. 621, and cases cited therein.] Earlier cases in this State are Andrew County v. Kirtley, 135 Mo. 31; Bryant v. Russell, 127 Mo. 422; State v Bixman, 162 Mo. 1.
Nor should we overlook the fact that under certain circumstances we can call to our assistance extrinsic aids in the construction of statutes. [Black on *314 Interpretation of Laws, pp. 196-7; Sedalia ex rel. v. Smith, 206 Mo. l. c. 364 et seq.]
In the Smith case we said: “These allowable extrinsic aids are numerous and varied, including public documents and papers, statutes in pari materia, contemporary history, contemporary construction and usage, executive and legislative construction, journals of the legislative body, opinions of legislators, motives of the legislative body and perhaps others.”
Prior to the 'Constitution of 1865 there was no restriction upon the legislative power in the matter of granting.exemptions from taxation. The public policy of the State prior to 1865, as evinced by numerous acts incorporating educational institutions and exempting their property from taxation, is clearly apparent. That public policy was to encourage and foster educational institutions. Some of these acts of the Legislature this court has -had occasion to discuss. [St. Vincent’s College v. Schaefer, 104 Mo. 267; State ex rel. v. Westminster College, 175 Mo. 52.]
Going now to the special acts pertaining to William Jewell College, we find that the college was incorporated by the Act of February 27, 1849. Some portions of this act will be necessary to reach the legislative intent as undertaken to be expressed in the Act of 1851.
The preamble of the Act of 1849 reads: “Whereas, the United Baptists in Missouri and their friends are desirous of endowing and building up a college in the State, and for that purpose have under the direction of the General Association of Baptists in Missouri already secured pledges to the amount of about twenty thousand dollars, for the endowment of the same in shares of forty-eight dollars, each payable in installments of six dollars per share annually, now therefore to enable the parties above mentioned to carry out their contemplated purpose,
*315 “Be it enacted by tbe General Assembly of the State of Missouri, as follows:”
By section 1 of the act, 26 persons named therein are constituted a body politic, with perpetual succession. By section 2 it was provided that the college mentioned should be located at some place in the State by a majority of the donors to the endowment of the same (one share of $48 constituting a vote) and also given a náme. •
Section 3 of the act thus reads: “After the college shall have been located and named as provided in the-second section, the persons named in the first section and their successors in office shall be- known and styled by the name of the trustees of the college thus named, and shall have full power in their corporate capacity, to hold by gift, grant, demise, devise, or otherwise any lands, tenements, hereditaments, monies, rents, goods, or chattels of what kind soever the same may be, which is or may hereafter be given, granted, demised to or purchased by them for and to the use of the aforesaid college, and may sell and dispose of the same or any part thereof or lease, rent or improve in such manner as they shall think most conducive to the interest and prosperity of said college. ’ ’
Other sections, from 4 to 12 inclusive, provide for the details of the corporation thus organized and the duties of the officers thereof, with other matters immaterial here. Section 13, the last section of the act is significant and reads: “That the property, real and personal, authorized to be held by said corporation by virtue of this act, shall be held and applied in good faith to the purposes of education according to the provisions of this act and for no other or different purpose.”
The significance of the last section lies in the fact that the use of the property is restricted to a public purpose. It clearly indicates the interest that the State was taking in the corporation. This is peeu *316 liary significant in view of the further fact that private corporations could be and were thus chartered by legislative enactments. It shows a legislative recognition of the fact that the property of this corporation was to be devoted to a public use, for in those days the diffusion of knowledge was so recognized. The State then recognized a duty upon its part to fulfill the ends of a republican form of government by encouraging the education of its citizens. There is at least a legislative declaration in this section 13, to the effect that the property of this corporation was to be devoted to a public purpose. If not, no reason could be assigned for the solicitude of the State in thus limiting the use of the property. It has always been the law that property used for state, county, municipal and other public purposes should not be taxed. Whatever may be called the public policy of the State since the Constitutions of .1865 and 1875-, there can be no question as to what it was before those dates. Not only is it evinced by this section 13 of the Act of 1849, but by other contemporaneous acts. There would have been ho special reason for limiting the use of the property of this corporation strictly to educational purposes, except upon the theory that there was a public purpose and some immunities might be expected from the State. By this section 13, the idea of a corporation for profit and gain is precluded even though it had not been admitted in this record.
Now with this situation let us take up the exemption statute in question. Starting with the proposition that the State was limiting the use of the property to be acquired by the corporation to a much-needed and public use, what means this exemption statute? "We say much-needed use, because we can not blind our eyes to the public history of our State. • Of such things courts take judicial cognizance. We should never lose sight of the fact that by this Act of 1849, the State was licensing the twenty-six men and their successors to *317 solicit and receive property of all kinds (not lands alone) from charitably disposed people, but in the interest of the State was impounding every cent of it for a public purpose. It costs to run public schools, and in those days the State was not situate as it is now. But even now, were it not for the 'great institutions of learning founded, as was this defendant, it would require at the hands of the State twice its present outlay for higher education. If a reason for the fixed public policy of those days be required, herein we have it. Nor should we overlook another matter, and that is from the year 1836 to 1863 there were some fifty-four colleges chartered by the State, and in none of the charters which we have examined is the funds of the institution so thoroughly impounded for public purposes as in the charter before us. We mean by this that the language is not so stringent, and so thoroughly cutting out the idea for profit and gain. Besides these colleges, great numbers of academies and seminaries were chartered.
Going now to the act in question, the defendant contends that the word “land” as therein used should be ¡construed as “property,” and thus fit the context of the original act providing for an endowment fund for the institution. By the original act the corporation was authorized to receive all. kinds of property for its use, which use was limitedas aforesaid. When these several acts were passed the Constitution of the State said to the lawmakers: ‘ ‘ Schools and the means of education shall forever be encouraged in this State.” Encouraged how? Not by the simple permissive act of giving them a mere license to exist. The State was interested in schools and the constitutional idea was to foster and aid them in such manner as could be done.
A few lines from State v. Fisk, supra, are appropriate here: “How can it be contended that it is the policy of the State to encourage education, and to levy direct taxes upon its citizens for the purposeoffurnisb *? ing education free, and at the same time refuse exemption to the property of educational institutions which conduce to cheapen education, and place the higher branches thereof within reach of those who would otherwise be a direct tax upon the people of the State, if they were to leave such institutions as this of the defendant, and resort to the public schools.”
The. aid provided by the Act of 1851 and other similar acts was such aid as the State could give. This Act of 1851 clearly exempts all further grants of land from taxation. It was evidently passed in the light of the fact that the college endowment was then wholly in the lands named in the act. It stands admitted that the lands mentioned in the Act of 1851 constituted the sole endowment fund of defendant at that time. We can see no good reason for the G-eneral Assembly exempting one class of property belonging to the endowment fund of the college and taxing the other class, especially in view of the fact that both classes were to be used for the same public purpose. In those days it would appear that endowments were largely made in lands. Not only so, but about the same time college after college was by its charter relieved of all kinds of taxes on all kinds of property for all time to come, and the act before us speaks of other institutions of learning. The original act authorized the gathering together of an endowment for the college. The fund thus collected was limited to a use which the State not only recognized as a. public use, but one which the State should foster and aid. To my mind when all the surroundings are considered, the public policy of the State considered, these two acts considered, and other acts about the same time are considered, it is evident that there was a legislative intent to relieve the property constituting the endowment fund of this corporation from the burdens of taxation.
In addition we have the construction placed upon the act by officials for the past half century. It is true *319 that such construction is not absolutely binding upon the courts, but it is at least strongly persuasive. Until the levy for the taxes in suit no official had failed to look upon this statute as one of absolute exemption. As said in Westerman v. K. of P., 196 Mo. l. c. 708, this construction is by no means conclusive, yet it is at least persuasive in effect. Considering all things, we think tbe construction given by the trial court, in- this_ an exceedingly close case, is the proper one.
III. It is next urged that this statute has been repealed by subsequent constitutional and statutory provisions. The claim is made that there is a direct repeal of the law or an attempted direct repeal of the law. The question, however, has been fully settled by the adjudications of this court upon similar statutes, and we shall not re-open nor re-argue it. [St. Vincent’s College v. Schaefer, 104 Mo. 261; State ex rel. v. Westminster College, 175 Mo. 52.
It follows from the foregoing that the judgment nisi should be affirmed, and it is so ordered.
PER CURIAM.
— -The foregoing opinion from Division One is adopted as the opinion of the Court in Banc.
Lamm, J., concurs; Woodson and Brown, JJ., concur in separate opinions filed; Valliant, G. J., and Ferriss and Kennish, JJ., dissent in opinion to be filed.