

# SUPREME COURT OF MISSOURI
# en banc

SALLY BOLAND, SHERRI LYNN HARPER, )
DAVID C. GANN, JENNIRAE LITTRELL, )
NATURAL DAUGHTER OF DECEDENT )
CLARENCE BAILEY WARNER, )
HELEN PITTMAN, NATURAL SISTER OF )
DECEDENT SHIRLEY R. ELLER, )
                                      )
        Appellants, )
                                      )
v. )         No. SC93906
                                      )
SAINT LUKE'S HEALTH SYSTEM, INC., )
AND SAINT LUKE'S HOSPITAL OF )
CHILLICOTHE F/K/A THE GRAND RIVER )
HEALTH SYSTEM CORPORATION D/B/A )
HEDRICK MEDICAL CENTER, AND )
COMMUNITY HEALTH GROUP, )
                                      )
        Respondents. )

### APPEALS FROM THE CIRCUIT COURT OF LIVINGSTON COUNTY
The Honorable Thomas N. Chapman and Jason A. Kanoy, Judges

*Opinion issued August 18, 2015*

The issue on appeal here is whether the trial courts erred in entering judgments on the pleadings in five wrongful death lawsuits on the basis that the causes of action were time-barred by the three-year limitation in section 537.100.[1]  The plaintiffs argue the

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

claims were not barred by the statute of limitation as the defendants intentionally and fraudulently concealed the tortious nature of the decedents' deaths. This Court finds that *Frazee v. Partney*, 314 S.W.2d 915 (Mo. banc 1958), remains good law and reaffirms both its holdings that a wrongful death claim accrues at death and that courts may not add exceptions to a special statute of limitation. Accordingly, despite the harsh result, this Court is obligated to follow the mandate of the statute. The plaintiffs' claims are time-barred because the three-year statute of limitation had passed when the lawsuits were filed, and section 537.100 does not provide for delayed accrual or an exception for fraudulent concealment. The judgments of the trial courts are affirmed.

## I. Factual and Procedural Background

The circumstances of these cases are tragic and deeply concerning. This appeal arises from five separate but essentially identical wrongful death claims brought by Sally Boland, Sherri Lynn Harper, David C. Gann, Jennirae Littrell, and Helen Pittman (the plaintiffs) against Community Health Group, Saint Luke's Health Systems, Inc., and Saint Luke's Hospital of Chillicothe (collectively, "the hospital"). The cases are now consolidated before this Court. Because the trial courts entered judgment on the pleadings in favor of the hospital, the following allegations of the plaintiffs are treated as admitted for purposes of this appeal. *See Emerson Elec. Co. v. Marsh & McLennan Cos.*, 362 S.W.3d 7, 12 (Mo. banc 2012).

The plaintiffs all had family members die while being treated at Hedrick Medical Center in Chillicothe in 2002. Sally Boland's father died February 3, 2002. Sherri Lynn

Harper's husband died March 22, 2002.  David C. Gann's father died March 30, 2002.

Jennirae Littrell's father died April 15, 2002.  Helen Pittman's sister died March 9, 2002.

The petitions allege that Jennifer Hall, a former employee of the hospital, was responsible for the deaths.  Specifically, the allegations are that over a period of time, Hall, a respiratory specialist, intentionally administered a lethal dose of succinylcholine, insulin, and/or other medication that resulted in the death of each of the decedents.[2] Hall's actions are alleged to have caused at least nine suspicious deaths and 18 suspicious "codes," which are medical emergencies, often involving cardiac arrest or the inability to breathe.

Further, the petitions allege that the hospital was aware of Hall's actions and acted affirmatively to conceal the suspicious nature of the deaths by: (1) threatening and coercing its employees to conceal information concerning Hall's actions; (2) failing to request autopsies so as to conceal the causes of death when there were several suspicious deaths; (3) informing or instructing its employees to notify patients' families that the causes of death were "natural" rather than due to Hall's actions; (4) disbanding committees put into place to evaluate codes and determine preventative measures; (5) failing to inform appropriate individuals and medical committees that had authority to act about Hall's behavior so that future harm by Hall could be prevented; (6) failing to investigate and/or monitor Hall when requested to do so by law enforcement;

---

[2] Succinylcholine is a muscle relaxant that paralyzes the respiratory muscles and normally is used to allow the insertion of a breathing tube into the throat of a patient who is still conscious. When administered in larger doses, succinylcholine will result in paralysis, and the patient suffocates to death.

3

(7) removing patients' medical records so they were inaccessible to the patients' physicians; (8) discarding or failing to preserve crucial material evidence contained in Hall's locker regarding her misconduct; and (9) impeding law enforcement's investigation of Hall.

Dr. Cal Greenlaw was a physician working at the hospital during the relevant period. In February 2002, Dr. Greenlaw treated a patient in the emergency room who suddenly "coded" due to a cardiovascular collapse. He could not account for the patient's unusual blood sugar/insulin events. He had previously become aware of two suspicious codes and resulting deaths prior to this incident and subsequently came to suspect that someone had been attempting to kill patients by injecting them with insulin or some other drug.

Dr. Greenlaw voiced these concerns to the hospital administration but was told by the hospital's director of nurses that there was no problem and not to discuss his suspicions further. Later, he told the hospital's administrator that he suspected Hall was intentionally killing patients at the hospital but was again told to abandon the matter for fear that the hospital's admissions would be jeopardized. However, he continued to gather evidence and, ultimately, became aware of 18 "code blues" and nine suspicious deaths at the hospital from February to May 2002 that occurred while Hall was on duty.

Aleta Boyd was a registered nurse and longtime employee of the hospital during the relevant period. She worked as the hospital's risk manager for internal events. In March 2002, she became aware of a dramatic increase in code blue events and deaths. She ultimately came to suspect that patients were intentionally being injected with insulin

4

and/or other drugs and began an internal investigation. She concluded that Hall was the cause of the events and communicated the findings to the director of nursing and to the hospital's administrator. Boyd, however, was instructed to keep the matter confidential and not to involve anyone else. She continued to receive reports of code blue events and deaths, ultimately becoming aware of approximately 15 patients who either coded or died under suspicious circumstances in which Hall was listed in the patient's record. Boyd and other nurses finally met with the hospital administration and communicated a desire to alert the media if the hospital failed to stop Hall.

Hall was suspended and later fired in May 2002 after another patient died under suspicious circumstances. After Hall's suspension, a bottle of insulin was found in her locker, despite there being no reason for her to have insulin or to administer medication to patients. The suspicious codes and deaths apparently ceased once Hall was fired.

The Joint Commission on Accreditation of Healthcare Organizations ultimately investigated the events at the hospital and identified a number of "sentinel" events occurring during 2002. A sentinel event is defined as "an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof." A health care provider is required to report such events to patients and their families. The plaintiffs, however, allege they were not notified of the circumstances surrounding the deaths of their family members until shortly before their petitions were filed.

The plaintiffs filed petitions against the hospital arguing they were entitled to damages under Missouri's wrongful death statute, section 537.080. The hospital filed motions for judgments on the pleadings, arguing that the claims were time-barred by

5

section 537.100, the three-year wrongful death statute of limitation. The trial courts granted the hospital's motions. The plaintiffs appeal.[3]

## II. Standard of Review

When reviewing the trial court's grant of a motion for judgment on the pleadings, this Court must determine "whether the moving party is entitled to judgment as a matter of law on the face of the pleadings." *Emerson Elec. Co.*, 362 S.W.3d at 12. The judgments will be affirmed if the facts pleaded by the plaintiffs, considered by the court as admitted, demonstrate that they could not prevail under any legal theory. *Id.*

## III. Statutory Provisions

Wrongful death in Missouri is statutory and has no common law antecedent. *Sanders v. Ahmed*, 364 S.W.3d 195, 203 (Mo. banc 2012). Section 537.080 provides, in relevant part:

> Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured . . . .

A limitation period within which all wrongful death claims must be brought is found in section 537.100. It provides that "[e]very action instituted under section 537.080 shall be commenced within three years after the cause of action shall accrue." Section 537.100 contains two exceptions to the statute of limitation: a tolling provision for defendants who abscond from the state to avoid personal service and a one-year savings provision if

---

[3] This Court granted transfer after opinion by the court of appeals. MO. CONST. art. V, sec. 10.

6

the plaintiff files a voluntary non-suit or the plaintiff's judgment is reversed and remanded on appeal. There are no other exceptions in the language of section 537.100.

By contrast, in chapter 516, the general statutes of limitation chapter, there is an exception for fraudulent concealment. Section 516.280 provides that, "[i]f any person, by absconding or concealing himself, or by any other improper act, prevent[s] the commencement of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented." Section 516.300, however, provides that: "[t]he provisions of sections 516.010 to 516.370 shall not extend to any action which is or shall be otherwise limited by any statute; but such action shall be brought within the time limited by such statute." In short, section 516.300 states that the general statutes of limitation and exceptions found in chapter 516 are not applicable to causes of action that contain their own special statutes of limitation. Section 537.100 is a special statute of limitation for wrongful death. As a result, the fraudulent concealment tolling exception in section 516.280 is not applicable to this case.

## IV. Analysis

All parties agree that neither of section 537.100's two exceptions apply to this case. Instead, the plaintiffs argue that the trial courts erred in granting the hospital's motions for judgment on the pleadings because, due to the hospital's fraudulent concealment, their wrongful death claims did not accrue until they learned of the wrongfulness of the hospital's conduct and were not time-barred by section 537.100. Alternatively, they contend that the statute of limitation was equitably tolled by the hospital's concealment, that the statute of limitation did not run, or that equitable estoppel

7

precludes the hospital from relying on the statute of limitation as a defense.  In other words, the plaintiffs argue either for delayed accrual under section 537.100 or for a *de facto* exception to the limitation period for fraudulent concealment.  The hospital counters that delayed accrual for wrongful death is not recognized in Missouri and that courts may not judicially graft a tolling mechanism onto a special statute of limitation that is not specifically provided for by the legislature.

### *A.* Frazee v. Partney *Remains Good Law*

At the center of both of the plaintiffs' arguments is this Court's decision in *Frazee v. Partney*, 314 S.W.2d 915 (Mo. 1958).  In *Frazee*, a family was involved in a car accident caused by a driver who fell asleep at the wheel.  *Id.* at 917.  Two people were killed, but the driver was unaware an accident had occurred because he did not see where the family's car went off the road.  *Id.*  The driver considered whether to go back and investigate but elected to proceed ahead to his destination.  *Id.*  The accident occurred in 1954, but the plaintiffs did not learn the driver's identity until March 1956.  *Id.*  They filed a wrongful death suit against the driver in September of 1956.  *Id.* at 916.  The defendant pleaded section 537.100, which at that time provided a one-year limitation period for wrongful death claims.  *Id.*  This Court considered two questions: (1) when a wrongful death cause of action accrues, and (2) whether the defendant's allegedly fraudulent concealment of his identity tolled or extended the limitation period in section 537.100.  *Id.* at 917.

With respect to delayed accrual, this Court addressed whether a wrongful death claim accrues at death or at the point when the suit "could be validly commenced and

8

maintained against an 'actual' defendant," i.e., when the identity of the defendant became known. *Id.* at 917. *Frazee* distinguished between the *existence* of a defendant and the *identity* of the defendant and noted that the language of section 537.100 specifically provided that the limitation period began at the accrual of the cause of action – when the plaintiff's injury was complete and not at the point when a lawsuit could be effectively commenced. *Id.* at 920-21. *Frazee* held that, despite the harshness of the outcome, the wrongful death claim accrued at the moment of death, even though the plaintiff argued the identity of the defendant had been fraudulently concealed. *Id.* at 921.

In addressing the driver's identity, *Frazee* rejected the argument that such concealment, even if fraudulent, tolled or extended the limitation period and held that section 537.100 "must carry its own exceptions":

> This court has uniformly held that where a statute of limitations is a special one, not included in the general chapter on limitations, the running thereof cannot be tolled because of fraud, concealment or any other reason not provided in the statute itself. . . . No other exceptions whatever are engrafted on that statute, and it is not the duty or the right of the courts to write new provisions into the statute.

*Id.* at 919. In reaching this conclusion, the Court noted that it was bound to consider only the plain language of section 537.100 and the legislative intent that language evidenced. *Id.* at 921. *Frazee* further found it significant that the legislature had twice amended section 537.100 since its adoption and added two exceptions yet never saw fit to craft a fraudulent concealment exception like the one codified at section 516.280. *Id.* at 920. "We are forced to construe the cold, clear words of the statute, and if its scope is to be enlarged we feel that the remedy is legislative, not judicial." *Id.* at 921.

9

The plaintiffs question the validity of *Frazee* in light of two subsequent decisions. First, in *O'Grady v. Brown*, 654 S.W.2d 904, 906-07 (Mo. banc 1983), this Court considered whether a fetus qualified as a "person" under the wrongful death statute. *O'Grady* held that the wrongful death statute was not in derogation of the common law and should be construed "with a view to promoting the apparent object of the legislative enactment." *Id.* at 908. In holding that the fetus was a "person" for purposes of wrongful death, this Court noted three basic objectives underlying the wrongful death statute: (1) to compensate bereaved plaintiffs for their loss, (2) to ensure that tortfeasors pay for the consequences of their actions, and (3) to deter future harmful conduct that might lead to death. *Id.* at 909.

Second, the plaintiffs cite *Howell v. Murphy*, 844 S.W.2d 42 (Mo. App. 1992), which relied on *O'Grady*. The plaintiffs argue that *Howell* abrogated *Frazee*. In *Howell*, the plaintiffs filed wrongful death claims against a man who murdered their loved ones and concealed the evidence for more than five years. *Id.* at 45. The plaintiffs could not file their claims within three years because the victims had not been found and, by statute, were presumed missing and not dead until five years had passed. *Id.* at 47. The court favorably cited *O'Grady* as a "major shift" in the interpretation of wrongful death, holding that the statute of limitation "should not be so strictly construed as to avoid the wrongful death statute's purposes." *Howell*, 844 S.W.2d at 46. It held that, due to the defendant's concealment of the bodies and the statutory presumption of life, section 537.100 was tolled "until the plaintiffs could, by reasonable diligence, ascertain they had

10

an action." *Id.* at 47. In its discussion, *Howell* also stated that "the reasoning of *Frazee* is superseded by *O'Grady*." *Id.* at 46.

*Howell* is in error. *Frazee* was never referenced or cited by this Court in *O'Grady*. Absent a contrary showing, an opinion of this Court is presumed not to be overruled *sub silentio*. *State v. Wade*, 421 S.W.3d 429, 433 (Mo. banc 2013). Additionally, *Frazee* and *O'Grady* are dissimilar because the statute of limitation was not at issue in *O'Grady*. As a result, *Frazee* remains good law. To the extent that *Howell* stated that *Frazee* is superseded by *O'Grady*, it should no longer be followed.[4]

### B. Delayed Accrual

To determine whether a statute of limitation bars recovery, it is necessary to establish when the cause of action accrued. *Jepson v. Stubbs*, 555 S.W.2d 307, 311 (Mo. banc 1977). A cause of action accrues, and the limitation period begins to run, when the right to sue arises. *Hunter v. Hunter*, 237 S.W.2d 100, 103 (Mo. 1951). *Frazee* held that a wrongful death claim accrues at death. This has long been the rule in Missouri. *See Coover v. Moore*, 31 Mo. 574, 576 (Mo. 1862); *Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 929 (Mo. banc 1933); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957). That rule is now reaffirmed. The language of section 537.100 is unambiguous,

---

[4] The plaintiffs argue that *Howell* controls this case. However, *Howell* is distinguishable. There, the plaintiffs were not aware they had a wrongful death claim because they could not be certain that a death had occurred due to the defendant's fraudulent concealment and the statutory presumption of life. *Howell*, 844 S.W.2d at 46. Here, by contrast, the plaintiffs had knowledge of their decedents' deaths; they lacked knowledge of the hospital's wrongful conduct regarding treatment of their decedents. The cases are inapposite, and *Howell* does not control.

11

and this Court's precedent is clear: the plaintiffs' claims accrued at the decedents' deaths, and section 537.100 does not provide for delayed accrual under these circumstances.

*C. Fraudulent Concealment Exception*

As the plaintiffs' claims accrued at death, the claims are time-barred unless an exception or tolling mechanism applies. The plaintiffs argue that due to the hospital's fraudulent concealment, the statute of limitation was equitably tolled, did not run, or that equitable estoppel prevents the hospital from relying on the statute of limitation as a defense. Though these are distinct legal concepts, under these circumstances they amount to an argument for a *de facto* exception to section 537.100 for fraudulent concealment.

Faced with statutory language that does not provide the fraudulent concealment exception they seek, the plaintiffs contend that this Court should construe the limitation period for wrongful death found in section 537.100 to avoid frustrating the remedial purpose behind wrongful death. They argue that section 537.100 can be interpreted "with reference to its spirit and reason so that, even if a case falls within the *letter* of the statute, courts are not bound thereby if the case is not within the spirit and reason of the law and the plain intention of the legislature." Essentially, they argue that the wrongful death statutory scheme's *purposes* can be used to override or amend its statutory *language*. They believe *Frazee* was wrongly decided, particularly in light of law in other jurisdictions.[5]

---

[5] The plaintiffs cite numerous cases from other jurisdictions in support of a fraudulent concealment exception to section 537.100. This citation of authority is impressive and spans

12

This Court is presented with an extremely difficult decision. What occurred here is undoubtedly a tragedy, and the plaintiffs put forth what amounts to a compelling policy argument for why their suits should be allowed to proceed. This proposed "freewheeling" approach to statutory interpretation, however, is also troubling, particularly when the precedent of this Court counsels a different result.[6]

### 1. Precedent Cautions Against Judicially-Created Exceptions

As noted above, *Frazee* remains good law and is directly on point in this case. It unambiguously held that "[a] special statute of limitation must carry its own exceptions and we may not engraft others upon it." 314 S.W.2d at 919. Despite the difficult result for the plaintiff, *Frazee* held that "[t]he legislature has not seen fit to enact for death actions either a tolling provision or a delayed accrual on account of fraud, concealment, or other improper act" and that it was "not the duty or the right" of the courts to add exceptions not provided for by statute. *Id.* at 919, 921. The principles of legislative deference as well as *stare decisis* must be respected.

---

nearly 200 years. However, law from other states or the federal courts is not controlling in applying section 537.100.

[6] The dissenting opinion argues this opinion ignores binding precedent on the interpretation of the wrongful death statute, citing *O'Grady*. Yet, notwithstanding the fact that *O'Grady* stated its holding was limited to the facts presented, 654 S.W.2d at 911, the language on which the dissent relies was made in a very different factual and legal context than here. And though the dissent casts aside the distinction, *O'Grady* does not control because it did not consider the statute of limitation. *O'Grady* weighed only the broad purposes behind the wrongful death statute. When a statute of limitation is also in play, however, its unique purposes should also be weighed. *O'Grady* never had to consider the purposes of the wrongful death statute in light of the purposes of the statute of limitation. Absent such analysis, *O'Grady* cannot conclusively determine this outcome. *Frazee*, however, which the dissent agrees is valid and binding, not only considered the wrongful death statute and section 537.100, but it did so in a similar context as this case – fraudulent concealment. *Frazee* controls over *O'Grady*.

Moreover, this is not the first time this Court has declined appealing policy arguments when applying statutes of limitation. In *Laughlin v. Forgrave*, 432 S.W.2d 308 (Mo. banc 1968), this Court, in construing section 516.140, RSMo 1959, held that a plaintiff's medical malpractice action was barred by the statute of limitation despite the claim that the injury – a foreign object left in the plaintiff's back following a surgery in 1951 – could not have been discovered within the limitation period. This is because the statute of limitation did not contain a discovery provision. *Id.* at 313. In rejecting the plaintiff's argument for the discovery rule, this Court stated that:

> This argument is appealing and has some force, so far as justice is concerned; in that respect the conclusion we reach is distasteful to us. But, the legislative branch of the government has determined the policy of the state and clearly fixed the time when the limitation period begins to run against actions for malpractice. This argument addressed to the court properly should be addressed to the General Assembly. Our function is to interpret the law; it is not to disregard the law as written by the General Assembly.

*Laughlin*, 432 S.W.2d at 314. Addressing the result of *Laughlin*, the General Assembly in 1976 repealed section 516.140 and enacted section 516.105, a new special statute of limitation for medical malpractice actions with a specific provision that, for foreign objects left inside the body, the limitation period began to run from the date of discovery. 1976 Mo. Laws 767 (codified as amended at section 516.105, RSMo 2000).

Similarly, in *Weiss v. Rojanasathit*, 975 S.W.2d 113 (Mo. banc 1998), this Court again addressed the statute of limitation for a medical malpractice action under section 516.105, RSMo 1994. In *Weiss*, the plaintiff received a routine gynecological examination and was told she would be notified of any abnormal results. *Id.* at 116. The

14

plaintiff was not notified that the test indicated a cancerous or precancerous condition. *Id.* During another examination nearly four years later, she discovered she had Stage IIb endocervix cancer. *Id.* She brought a medical malpractice action based on failure to notify, arguing that because her injury was not capable of being discovered until the subsequent examination, her claim was not barred by the two-year limitation period of section 516.105, RSMo 1994. *Id.* at 117.

*Weiss* rejected the various proffered discovery theories and held that the discovery exception added after *Laughlin* was limited to cases concerning foreign objects. *Id.* at 120. Citing the above language from *Laughlin,* the Court noted that the outcome was a hardship to the plaintiff but that "[t]he general assembly evidenced its clear intent to limit a discovery rule to cases concerning foreign objects. That is its prerogative. This Court must follow the policy determination expressed there." *Id.* at 121. Additionally, the plaintiff's argument that equitable estoppel should prevent the defendant from asserting the statute of limitation as a defense was rejected. *Id.* at 120. In response, during the next legislative session in 1999, the General Assembly amended section 516.105, adding a discovery exception for cases where the act of negligence is "negligent failure to inform the patient of the results of medical tests." 1999 Mo. Laws 329.

*Frazee*, *Laughlin*, and *Weiss* do not seek to incentivize fraudulent acts. Rather, they stand for the principle that it is this Court's role to interpret the law, not rewrite it. Accordingly, the plaintiffs' argument here is one better made to the General Assembly, which is in the best position to determine policy on exceptions to statutes of limitation. *See Hunter*, 237 S.W.2d at 104 (exceptions to statutes of limitation are matters of public

15

policy for the General Assembly; exceptions are to be strictly construed and not enlarged by courts upon considerations of hardship).[7]

It is further noted that, although the result the plaintiffs argue for is appealing, the method of using a common law equitable maxim to work around the dictates of section 537.100 is inherently problematic. Equity should not be deployed in a manner that countermands the clear intent and language of the legislature, particularly in regard to a statutorily created cause of action. This Court has previously held that:

> Equity Courts may not disregard a statutory provision, for where the Legislature has enacted a statute which governs and determines the rights of the parties under stated circumstances, equity courts equally with courts of law are bound thereby. *Equity follows the law more circumspectly in the interpretation and application of statute law than otherwise*.

*Milgram v. Jiffy Equip. Co.*, 247 S.W.2d 668, 676-77 (Mo. 1952) (emphasis added) (internal citations omitted). Implicit in the plaintiffs' argument is that all equitable maxims become a part of all statutory schemes unless expressly written out of the law by the legislature. This merely invites the future reexamination by courts of otherwise settled areas of statutory interpretation, and this Court declines to so hold.

---

[7] There is also historical precedent for this view:

> It was at one time held in regard to these [statutes of limitations], that where by reason of the defendant's fraud the existence of a cause of action was concealed, it would furnish an equitable exception to the express language of the statute. [B]ut the idea that implied and equitable exceptions, which the Legislature has not made, are to be engrafted by the courts on a statute of limitations is now generally abandoned.

THEODORE SEDGWICK, A TREATISE ON THE RULES WHICH GOVERN THE INTERPRETATION AND CONSTRUCTION OF STATUTORY AND CONSTITUTIONAL LAW, 277 (Pomeroy, ed., 2d ed. 1874, reprint 2012).

## 2. Legislative Intent of Section 537.100

The plaintiffs argue that the legislature could not have intended for the wrongful death statutory scheme to operate in this manner and that the primary rule of interpretation is to give effect to the legislature's intent as reflected in the plain language of the statute. *See Fred Weber, Inc. v. Dir. of Revenue*, 452 S.W.3d 628, 630 (Mo. banc 2015). Though it is rendered somewhat tertiary in light of the plain language of section 537.100 and precedent regarding judicially created exceptions to special statutes of limitation, the legislative history of section 537.100 indicates a legislative intent not to provide the exception the plaintiffs seek.

Prior to the result in *Frazee*, the General Assembly twice amended section 537.100 to add exceptions. In 1905, a one-year savings provision to allow a new suit following dismissal without prejudice was added. 1905 Mo. Laws 137 (codified at section 2868, RSMo 1906). In 1909, a tolling provision for defendants who abscond from the state to avoid personal service was added. 1909 Mo. Laws 463 (codified at section 5429, RSMo 1909). In enacting these two exceptions to the limitation period, the General Assembly declined to adopt an exception for fraudulent concealment. Yet it appears the legislature was well aware of how to provide for a fraudulent concealment exception to a statute of limitation as such an exception, currently codified at section 516.280, has existed in Missouri for over 150 years. *See* Limitation: art. 8, sec. 3, RSMo 1836. The legislature could have added a fraudulent concealment exception to section 537.100, but it did not.

Even after *Frazee*, the General Assembly twice more amended section 537.100 but has never seen fit to craft a fraudulent concealment exception. Instead, it chose to alleviate the result in *Frazee* by enlarging the limitation period – first from one year to two years in 1967, then to three years in 1979. 1967 Mo. Laws 665; 1979 Mo. Laws 631. The Court respects these legislative choices and "presume[s] that the legislature acted with a full awareness and complete knowledge of the present state of the law." *State v. Rumble*, 680 S.W.2d 939, 942 (Mo. banc 1984).

## V. Conclusion

Although it is difficult to reach a conclusion here that leaves the plaintiffs without a remedy, it was written over a century ago that "[h]ard cases . . . are apt to introduce bad law." *Winterbottom v. Wright*, (1842) 152 Eng.Rep. 402 (Exch.). In that regard, this Court echoes the sentiment of *Laughlin* in recognizing that, though the outcome is distasteful, "the legislative branch of the government has determined the policy of the state and clearly fixed the time when the limitation period begins to run . . . . Our function is to interpret the law; it is not to disregard the law as written by the General Assembly." 432 S.W.2d at 314. The judgments of the trial courts are affirmed.

_____
Mary R. Russell, Judge


Breckenridge C.J., Fischer, and Wilson, JJ., concur;
Draper, J., concurs in part and dissents in part in separate opinion filed;
Stith and Teitelman, JJ., concur in opinion of Draper, J.



# SUPREME COURT OF MISSOURI
## en banc

SALLY BOLAND, SHERRI LYNN HARPER, )
DAVID C. GANN, JENNIRAE LITTRELL, )
NATURAL DAUGHTER OF DECEDENT, )
CLARENCE BAILEY WARNER, AND )
HELEN PITTMAN, NATURAL SISTER OF )
DECEDENT SHIRLEY R. ELLER, )
                                        )
               Appellants, )
                                          )
v. )          No. SC93906
                                          )
SAINT LUKE'S HEALTH SYSTEM, INC., )
AND SAINT LUKE'S HOSPITAL OF )
CHILLICOTHE F/K/A THE GRAND RIVER )
HEALTH SYSTEM CORPORATION D/B/A )
HEDRICK MEDICAL CENTER, AND )
COMMUNITY HEALTH GROUP, )
                                          )
               Respondents. )

## OPINION CONCURRING IN PART AND DISSENTING IN PART

I concur with the principal opinion's holding that *Frazee v. Partney*, 314 S.W.2d 915 (Mo. 1958), remains valid precedent despite the assertion to the contrary in *Howell v. Murphy*, 844 S.W.2d 42 (Mo. App. W.D. 1992). I further agree that a wrongful death cause of action accrues at the decedent's death, and section 537.100, RSMo 2000,[1] does not contain an explicit tolling exception for a tortfeasor's fraudulent concealment.

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

However, I believe the holding in S*tate ex rel. Bob T. Beisly III v. The Hon. Timothy Perigo*, --- S.W.3d --- (No. SC94030) (Mo. banc 2015), handed down this same day and addressing this precise legal issue, supports the plaintiffs' claim that the doctrine of equitable estoppel forecloses the hospital from relying on the wrongful death statute of limitations as an affirmative defense due the fraudulent concealment of its wrongdoing. The principal opinion casts aside the common law maxim that fraud vitiates everything, which is a fundamental tenet of this country's jurisprudence, in favor of uncorroborated speculation as to the meaning of legislative inaction. This abandonment of a longstanding, well-respected legal foundational tenet results in the complete perversion of justice in this case. The principal opinion wholly abdicates its judicial responsibility to interpret the law and follow binding Missouri and federal precedent. It subjugates the Court to speculative intent in such a way as to eviscerate the separation of powers doctrine. A court must follow and enforce the explicitly stated words of the legislature, but it may not, to the detriment of the public, bind litigants to what the legislature fails to say as conclusive intent to justify this abhorrent outcome. I believe the circuit courts erred in dismissing the plaintiffs' causes of action, and I would reverse the judgments and remand for further proceedings.

### Factual Background

Because the hospital's fraudulent concealment is the linchpin of the plaintiffs' equitable estoppel claim, I believe additional facts omitted from the principal opinion are essential to illuminate exactly how tragic and deeply concerning the hospital's actions were in this case. Aleta Boyd (hereinafter, "Boyd") attempted to voice her suspicions

2

about Jennifer Hall's (hereinafter, "Hall") involvement in the decedents' deaths to the hospital on numerous occasions. Boyd reported her findings to the director of nursing, who instructed Boyd not to speak to the other nurses or involve anyone else in the matter and to keep the issue confidential. The hospital's administrator told Boyd that her concerns were unfounded, which left Boyd with the "distinct impression … that if [she] got very aggressive in [the] investigation of this matter that [she] would no longer be employed" by the hospital. Despite receiving additional troubling reports and there being additional suspicious codes, Boyd was instructed repeatedly to not inform anyone, including other nurses, staff or patients, about her suspicions regarding Hall.

After several months of suspicious codes and deaths, Boyd and other nurses met with the hospital's administration and presented the records of fifteen patients who coded or died suspiciously. Hall was listed in every patient's record. The nurses indicated they wanted to report the incidents to the local media if the hospital's administration took no action. The hospital's administration was concerned about negative media coverage and being sued by Hall if the allegations were baseless.

Dr. Cal Greenlaw (hereinafter, "Dr. Greenlaw") investigated the suspicious codes and deaths that he observed while working at the hospital. Dr. Greenlaw met with nurses, contacted the county coroner and prosecuting attorney, and spoke with the hospital's administration about his concerns. Dr. Greenlaw was told at a staff meeting that the hospital did not have a problem and "if anyone breathes a word of this, you'll be fired." Dr. Greenlaw was told his suspicions could not be revealed because it would impact the hospital's admissions.

3

Ultimately, Hall was terminated, and the suspicious codes and deaths ceased. The plaintiffs' medical expert opined the hospital had a duty to investigate and document possible "sentinel events" triggered by the pattern of suspicious codes and deaths at the Hospital. The expert opined the hospital "would have a duty to disclose and notify the families of the persons suspected of being murdered and/or harmed because of [its] suspicion that these events were taking place based on [its] investigation and notice by [its] staff members." The hospital successfully hid this sentinel information concerning at least eighteen patients, by use of duress and threat of termination, for approximately eight years. Later, while contesting the sufficiency of the plaintiffs' fraud claims, the hospital pondered, without a trace of irony, how the plaintiffs were able to develop a good faith basis to file their pleadings because they did not allege the hospital later advised them of the concerns surrounding Hall's actions.

## *O'Grady*'s Applicability

The principal opinion reaffirms the holding in *Frazee*, which construed the wrongful death statute of limitations. Yet the principal opinion disregards the importance of this Court's holding in *O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983). In *O'Grady*, this Court explained that the wrongful death statute is not in derogation of the common law, and it does not take away any common law right. *O'Grady*, 654 S.W.2d at 908. Rather, the wrongful death act was "designed to mend the fabric of the common law, not to weaken it." *Id*. This Court rejected the argument that the wrongful death statute had to be construed strictly and, instead, applied the statute's language "with a view to promoting the apparent object of the legislative enactment." *Id*. at 907-08

4

(quoting *United Air Lines, Inc. v. State Tax Comm'n*, 377 S.W.2d 444, 451 (Mo. banc 1964)). This Court recognized its duty "to perceive the import of major legislative innovations and to interweave the new legislative policies with the inherited body of common law principles." *Id.* at 908 (quoting *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 392, 90 S. Ct. 1772, 1783, 26 L.Ed.2d 339 (1970)).

This Court set forth three basic objectives the wrongful death statute was enacted to achieve: (1) "to provide compensation to bereaved plaintiffs for their loss;" (2) "to ensure that tortfeasors pay for the consequences of their actions;" and (3) "to deter harmful conduct which might lead to death." *Id.* at 909. The Court stated, "[T]he wrongful death statute evidences a legislative intent to place the cost of 'unsafe' activities upon the actors who engage in them, and thereby provide a deterrent to tortious conduct." *Id.* at 908. Applying these real, not purely speculative, objectives, this Court held section 537.080 provided a cause of action for the wrongful death of a viable fetus. *Id.* at 911.

On the one hand, the principal opinion acknowledges *Howell*'s observation that this Court "announced a major shift in its interpretation of Missouri's wrongful death statute" in *O'Grady*. *Howell*, 844 S.W.2d at 46. Yet, despite paying lip service to *stare decisis*, the principal opinion dismisses this binding statutory interpretation by merely stating that because *O'Grady* did not address the wrongful death statute of limitations, this limited its applicability here. I strongly disagree.

The thrust of the principal opinion's holding is that this Court has a duty to conduct statutory interpretation, not statutory revision. The principal opinion then flies directly in the face of binding precedent. This precedent instructs how a court should

5

construe the wrongful death act, specifically "to perceive the import of major legislative innovations and to interweave the new legislative policies with the inherited body of common law principles" and to construe the wrongful death act with a view to promoting the apparent object of the legislative enactment. *O'Grady*, 654 S.W.2d at 908. Rather, the principal opinion, after explicitly stating the purposes for which the statute was enacted, which were recognized clearly in *O'Grady*, states these very principles have nothing to do with discerning legislative intent, which is confounding. The principal opinion's failure to apply *O'Grady*'s statutory interpretation directives thwarts all of the objectives of the wrongful death act. Hence, this results in the plaintiffs having no opportunity for compensation because they cannot even survive a motion to dismiss. The hospital will not pay for the consequences of its actions; it has been rewarded for concealing its wrongdoing for years. The hospital and other entities like it are not deterred from engaging in harmful conduct that will lead to death because the principal opinion has released them from liability for successfully concealing their wrongdoing. The principal opinion's refusal to apply *O'Grady* does nothing to respect *stare decisis* or our legislature's clearly expressed intent in enacting the wrongful death act.

### Equitable Estoppel

The plaintiffs make a compelling legal argument that the salutary purposes of the wrongful death statute enunciated in *O'Grady* will be frustrated and basic common law maxims will be offended by permitting the hospital to reap the benefits of its fraudulent concealment by using section 537.100 as a sword instead of a shield to protect itself from liability in the face of its fraudulent conduct. The principal opinion makes light work of

6

the plaintiffs' equitable estoppel argument, finding in a footnote that, while the plaintiffs' jurisprudential authority was "impressive and span[ned] nearly 200 years," none of it was controlling in interpreting section 537.100. While this Court is not bound by the authority of its sister states, it is bound, however, to follow its own decisions. Both *O'Grady* and United States Supreme Court decisions provide guidance about the application of equitable estoppel to statutes of limitation, which this Court must follow. The principal opinion chooses to ignore the abundance of case law that supports the plaintiffs' argument by relegating its discussion to a footnote rather than actually addressing the issue at hand.

"Statutes of limitation are primarily designed to assure fairness to defendants." *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 429, 85 S. Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). Further, "[s]tatutes of limitation … are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49, 64 S. Ct. 582, 586, 88 L. Ed. 788 (1944). "The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Id*. at 349. The principal opinion notes an important policy rationale behind the statute of limitations is to prevent the assertion of stale claims. "This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights" because, in those cases, "a plaintiff has not slept on

7

his [or her] rights but, rather, has been prevented from asserting them." *Burnett*, 380 U.S. at 429. Taking the plaintiffs' claims of the hospital's fraudulent concealment as true, this Court must accept that the plaintiffs did not sleep on their rights or assert a stale claim.

With respect to Missouri's wrongful death statute, this Court explained:

> The statute in question was designed not only to punish the wrongdoer, but to remove the technical rule of the common law of harsh injustice, and in its stead give a right of action for wrongful death, for the benefit of the persons named in the statute. The statute is remedial, at least to the extent that it gives named beneficiaries a remedy against the party causing the wrongful death, where none existed at common law. ***Remedial statutes should be construed in the light of the prior common law, the mischief to be remedied, and the remedy provided, so as to suppress the mischief and advance the remedy.***

*Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 933 (Mo. banc 1933) (Frank, J., concurring) (emphasis added). This Court reaffirmed these notions in *O'Grady*:

> Death statutes have their roots in dissatisfaction with the archaisms of the [the common-law rule of no liability] …. ***It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied.*** There are times when uncertain words are to be wrought into consistency and unity with a legislative policy which is itself a source of law, a new generative impulse transmitted to the legal system.

*O'Grady*, 654 S.W.2d at 909 (quoting *Van Beeck v. Sabine Towing Co.*, 300 U.S. 342, 350-51, 57 S. Ct. 452, 456, 81 L.Ed. 685 (1937)) (Emphasis added).

A basic common law maxim, deeply rooted in this country's jurisprudence and older than the country itself, is that no person shall take advantage of or benefit from his or her wrong. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232, 79 S. Ct. 760, 762, 3 L.Ed.2d 770 (1959). "[T]his principle has been applied in many diverse classes of cases by both the law and equity courts and ***has frequently been employed to bar***

8

***inequitable reliance on statutes of limitations***." *Id*. at 232-33. (Emphasis added). The

principle of equitable estoppel was described in *Glus*:

> [W]here one party has by his representation or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of the advantage …. [T]he general doctrine is well understood and is applied by courts of law as well as equity where the technical advantage thus obtained is set up and relied on to defeat the ends of justice or establish a dishonest claim.

*Glus*, 359 U.S. at 234 (quoting *Union Mut. Ins. Co. v. Wilkinson*, 80 U.S. 222, 233

(1871)).

"The purpose of the doctrine of equitable estoppel is to prevent a party from taking

inequitable advantage of a situation he or she has caused." *Weiss v. Rojanasathit*, 975

S.W.2d 113, 120 (Mo. banc 1998). "A party is estopped to plead the statute of

limitations only if that party made positive efforts to avoid the bringing of the suit against

her or misled the claimants." *Id*. To apply the doctrine of equitable estoppel to bar a

defendant's statute of limitations defense, the defendant must have acted affirmatively to

induce the plaintiff to delay bringing the action. *Id*.

The principal opinion cites *Weiss* as an example of this Court's judicial restraint in

failing to adopt "an appealing policy argument" and strictly construing a statute of

limitations by deferring to the legislature's pronouncement and rejecting an equitable

estoppel argument. However, a close reading of *Weiss* demonstrates this Court analyzed

the merits of the plaintiff's equitable estoppel argument. While this Court ultimately

rejected the plaintiff's estoppel claim, it was because there was no showing the doctor

acted affirmatively to induce the plaintiff to delay filing her lawsuit. *Weiss*, 975 S.W.2d

9

at 121. Accordingly, it was the plaintiff's failure to plead the proper elements of equitable estoppel that caused her claim to fail, not this Court's unwillingness to apply equitable estoppel to statutes of limitation.[2]

While this Court is not bound to follow its sister states on issues of statutory interpretation, the cases can be instructive, especially when addressing the same legal issue under similar statutory frameworks. Several states have cited *Glus*' equitable estoppel principles to prevent a defendant from asserting the statute of limitations as an affirmative defense in wrongful death actions when that defendant has committed fraud to conceal his or her actions. Further, other jurisdictions applied the common law maxim regarding fraud vitiating any assertion of the statute of limitations in wrongful death actions, although without citation to *Glus*. Moreover, there are cases that apply these common law maxims and equitable estoppel to prevent defendants who have committed murders from relying on the wrongful death statute of limitations as a defense when sued civilly. To avoid unduly lengthening this dissent, see *Beisly*, --- S.W.3d --- (Slip op. at pages 13-16), for a full discussion of these cases. In summation, these states, under similar wrongful death statutory frameworks, have seen fit to apply the long-standing

---

[2] Likewise, the principal opinion points to *Laughlin v. Forgrave*, 432 S.W.2d 308 (Mo. banc 1968), as another example of this Court's judicial restraint in declining to adopt the discovery rule in a medical malpractice action, even though the result was harsh. Reliance on *Laughlin* is misplaced because the discovery rule does not have its genesis in basic common law maxims that prohibit individuals from benefiting from their own fraud. Moreover, neither *Laughlin* nor *Weiss* found any fraudulent concealment by the tortfeasors. By contrast, this Court must, under its standard of review, find the hospital fraudulently concealed its wrongdoing in such a way as to prevent plaintiffs from asserting their claims, which puts equitable estoppel squarely at issue.

10

doctrine of equitable estoppel to prevent a wrongdoer from benefiting from his or her own fraud, even when their statutes do not contain an express exception.

Although characterized as a "compelling policy argument" and then disregarded as a "'freewheeling' approach to statutory interpretation" by the principal opinion, Missouri would not enter into unchartered territory in applying equitable estoppel to wrongful death statutes of limitation. Missouri's adoption of these common law maxims predates *Glus*. In *Perry v. Strawbridge*, 108 S.W. 641 (Mo. 1908), although not a wrongful death action, this Court reiterated the basic principle that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxima are adopted by public policy, and have their foundation in universal law administered in all civilized countries." *Id*. at 642-43 (quoting *Box v. Lanier*, 79 S.W. 1042, 1045 (Tenn. 1904)). This Court acknowledged these common law maxims were adopted expressly as Missouri law and later codified by section 1.010, the common law reception statute. *Id*. at 644. In *Perry*, this Court considered, and ultimately rejected, the notion that these common law maxims were "either expressly or impliedly changed or modified" by statute or that the common law either repealed, changed or modified them. *Id*.

Section 1.010 expressly provides that "all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof." This comports with this Court's instruction in *O'Grady* that the wrongful death act be construed so as "to perceive the import of major legislative innovations and to interweave

11

the new legislative policies with the inherited body of common law principles." *O'Grady*, 654 S.W.2d at 908.

The principal opinion also states the legislative history of section 537.100 indicates the General Assembly's intent to not include a fraudulent concealment exception. The principal opinion strongly adheres to the concept of legislative acquiescence or inaction to support its position. The principal opinion claims that, because the legislature has not amended section 537.100 to include any fraudulent concealment exception after this Court's decision in *Frazee*, the legislature's inaction is conclusive no matter what factual or legal scenario is presented later. This Court has held that, while legislative inaction is "not conclusive of legislative approval, such inaction can be considered." *South Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 669 n.11 (Mo. banc 2009). Further, this Court has cautioned, "[I]t is speculative to infer legislative approval from legislative inaction." *Med. Shoppe Int'l, Inc. v. Dir. of Revenue*, 156 S.W.3d 333, 334 (Mo. banc 2005). This Court's jurisprudence is clear that when common law maxims are not codified, they continue to exist and should be interwoven with the statute's interpretation, unless those maxims have been changed, modified, or eliminated. *Perry*, 108 S.W. at 644.

The principal opinion's reading of the statute leads to an illogical and absurd result. One cannot fathom that the legislature's intent when enacting the wrongful death statute of limitations was to permit tortfeasors to evade liability for causing wrongful deaths so long as the tortfeasors could conceal their wrongdoing until the statute of limitations expired, while other torfeasors, guilty of the same conduct, except for the

12

fortuity that it merely caused injury instead of death, or merely were not as good at concealing their actions, would be held liable for damages.

Finally, I believe applying equitable estoppel to foreclose the hospital from asserting the statute of limitations does nothing to engraft a "*de facto* exception" onto section 537.100. Equitable estoppel prevents a wrongdoer from pleading the statute of limitations as a defense for purposes of a motion to dismiss. It does not contradict the notion that a wrongful death claim accrues at death nor does it toll the running of the statutory period. It simply prevents the hospital from asserting this defense if the plaintiffs prove the hospital fraudulently concealed its actions such that it prevented the plaintiffs from filing their claims. It is important to note that applying equitable estoppel does not mean the plaintiffs are entitled to relief on their claims against the hospital. The plaintiffs must still prove fraud, along with the elements of wrongful death, to prevail.

**Conclusion**

The principal opinion's inordinate adherence to a purely speculative interpretation of inaction results in what *O'Grady* explicitly cautioned against: "It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied." *O'Grady*, 654 S.W.2d at 909. The principal opinion's decidedly narrow and grudging construction of section 537.100 does *everything* to perpetuate the evils committed by the hospital and does *nothing* to promote the legislative purpose and provide the plaintiffs an opportunity to find a remedy. Most disturbing is the principal opinion's implicit absolution of the hospital's abhorrent misdeeds in this case. While this country's deeply embedded jurisprudence supports the

13

notion that fraud vitiates everything, the principal opinion's holding vindicates fraud, so long as one can beat the clock running on the statute of limitations. While the principal opinion insists its statutory deference in this tragic case does not incentivize fraud, the reality is otherwise. The practical lesson learned from today's holding in this case is this: In Missouri, if one wants to insulate oneself from wrongful death liability, employ any means necessary to conceal the wrongdoing, including violating medical ethics, ignoring legal obligations, and threatening employees with termination for wanting to remedy the wrong or whistleblow on it. So long as one can maintain this coercive, covert silence beyond the three-year statute of limitations, the unspoken intent has been achieved and the wrongdoer is rewarded.

Based on the reasoning set forth in *Beisly* and the arguments here, I would hold equitable estoppel forecloses the hospital from relying on the statute of limitations as an affirmative defense due to its fraudulent concealment. To hold otherwise would permit the hospital to benefit from its own fraud in contravention of deeply rooted common law maxims and would offend the three objectives advanced by our legislature that the wrongful death act was enacted to achieve as discussed in *O'Grady*.

_____
GEORGE W. DRAPER III, JUDGE

14