

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| CITY OF NORTH KANSAS CITY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD81650 |
| | ) | |
| ARCHER DANIELS MIDLAND COMPANY, | ) | Opinion filed:  February26, 2019 |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**THE HONORABLE LARRY D. HARMAN, JUDGE**

Before Division Two:  Edward R. Ardini, Jr., Presiding Judge,
Alok Ahuja, Judge and Gary D. Witt, Judge

The City of North Kansas City, Missouri (NKC) filed suit in the Circuit Court of Clay County against Gary Tauvar and Archer-Daniels-Midland Company (ADM) alleging public nuisance and negligence. The trial court granted summary judgment in favor of ADM finding that (1) ADM was not, as a former owner of the property in question, liable for any nuisance because Tauvar knew the condition of the property when he purchased it; and (2) NKC's claims were barred by the applicable statutes of limitations. NKC appeals. Finding no error, we affirm.

## I.    Factual and Procedural Background

ADM owned property located at 1400 Nodaway in North Kansas City, Missouri. This property contained a grain elevator and was surrounded by operating railroad tracks owned by

Norfolk Southern Railway. In 2002, ADM sold the property by quit claim deed for $1.00 to Tauvar. The property was not being used as a functioning grain elevator when ADM sold it to Tauvar.

*First Notice of Abatement*

NKC completed an inspection of the property on October 28, 2003. The inspection was conducted by NKC's senior building code inspector and was in response to a complaint that salvage material was being dumped on the property.

The day after the inspection, NKC sent Tauvar a notice of abatement stating that "the above-mentioned structure has been found to be unsafe." It further stated that the structure was "dangerous to life, property and safety of the public." The notice did not specifically identify the referenced structure; instead, the subject of the notice was "Property located on E. 14th (unsafe structure)." The notice listed a number of dangerous conditions, required Tauvar to close and secure the structure within ten days, and required him to submit a plan to NKC within 30 days to repair or demolish the structure. The city posted the notice of abatement and a notice of condemnation on the property.

Two weeks later, officials from NKC again inspected the property. A few days after this inspection, NKC's senior building code inspector sent a memo to NKC's chief of police stating, in part, as follows:

> The property has been placarded by NKC Code Enforcement as "CONDEMNED" Unsafe For Occupancy. This is due to structural alterations made to one of the metal silos without obtaining a building permit and the generally dilapidated condition of all of the structures on the property. No person should be allowed to enter any of the buildings on the property, as this is a code violation.

The following week, NKC cited Tauvar for failing to comply with the previously issued notice of abatement. NKC also generated several reports documenting the condition of the property, including that the notice of abatement "gave Mr. Tauvar 10 days to have the structures closed and

2

secured[,]" but "it is evident that Mr. Tauvar is still dumping and occupying this property and has failed to close or secure the structures."

*Second Notice of Abatement*

In June 2004, NKC performed another inspection of the property. The following month, Tauvar applied for a permit "to provide structural support to opening in metal grain bin and to repear [sic] openings/support to effect drive thru." NKC denied Tauvar's permit application.

In September 2004, an additional inspection was performed by the city resulting in a second abatement notice being sent to Tauvar. This abatement notice declared the property a nuisance based on "numerous safety violations." The abatement notice also ordered Tauvar to take action within ten days to correct the violations, including that "[s]tructures and property shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public[,]" and "[a]ccess to all structures and property must be secured."

Tauvar attempted to resolve some of the violations found by NKC by hiring a contractor to demolish metal silos and by obtaining a razing permit from NKC. However, the demolition produced an even more dangerous condition for the neighboring railroad prompting NKC to revoke the razing permit and render the structure safe at its own expense.

*Third Notice of Abatement*

In the early part of 2005, NKC twice inspected the property. A third notice of abatement was issued by NKC in the summer of that year. This notice of abatement found "the property to be in violation of the City Code and hereby declared a nuisance." The notice again listed numerous violations and stated that "[s]tructures and property shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public." The notice warned that "[f]ailure to bring [the] property in to [sic] compliance with the code will result in legal action." In August

3

2005, Tauvar indicated to NKC that he was in the process of removing materials that were located on the property and that, after those materials were removed, he would begin "demolition of facilities." No facilities were demolished.

*Order of Demolition*

Nearly eight years later, in January 2013, NKC again inspected the property and sent Tauvar a Notice of Violation/Order of Demolition.[1] This notice stated that "the referenced structure is hereby deemed to be dangerous and unsafe." No specific structure was mentioned. The following violations were noted:

   A.  Fourteen (14) structures were vacant with openings and broken windows at the time of inspection.

   B.  The property was in a state of deterioration and disrepair.

   C.  The exterior of the structures show lack of maintenance in need of overall repair and paint.

The notice then indicated specific issues with the property and concluded that "all structures on subject property are hereby ordered to be demolished. Demolition of these structures on subject property will need to be completed by April 30, 2013." No structures were demolished by that deadline.

In May 2014, an engineer submitted a report to NKC expressing his opinion concerning the dangers on the property, including "the ongoing falling of heavy building materials from the upper portions of the structures. There are significant pieces of concrete that are spalling from all sides of the grain elevators as well as pieces of metal hanging from the sides of the buildings."

---

[1] There is no information in the record to indicate that NKC took any action regarding this property between August 2005 and January 2013.

A year later, the community development director for NKC conducted a hearing about the structures on the property. Following the hearing, the community development director declared that the structures on the property constituted a dangerous public nuisance and needed to be demolished.

*NKC's Lawsuit*

On September 29, 2016, NKC filed its petition against ADM and Tauvar[2] for public nuisance[3] and negligence.[4] In its petition, NKC alleged that the property at 1400 Nodaway had been vacant since 2002, when it was acquired by Tauvar from ADM. NKC also alleged that, "[u]nbeknownst to the City, . . . at the time the [p]roperty was transferred to Mr. Tauvar, ADM had allowed the [p]roperty to fall into disrepair and the [p]roperty constituted a public nuisance." NKC alleged that its Code Enforcement Division "for the first time [on January 15, 2013,] conducted an inspection of the [p]roperty and discovered multiple violations of the Code of the City of North Kansas City, Missouri[.]"

ADM moved for summary judgment,[5] alleging that because it had sold the property in 2002, and because Tauvar knew of the condition of the property when he purchased it, ADM could

---

[2] Tauvar did not respond to the petition, and NKC was granted a default judgment against him.

[3] NKC alleged in its petition that "[t]he condition of the Property annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community and substantially impairs common community rights including: public health, safety, peace and convenience."

[4] NKC alleged in its petition that both defendants "owed a duty to the surrounding property owners, including the City, to maintain the Property so that it does not damage the surrounding properties[;]" that they "know or should know that the Property poses a risk to the surrounding properties but have not taken any action to repair, maintain, or demolish the buildings and structures on the Property[;]" that they "failed to use a reasonable degree of care by repairing, maintaining, or demolishing the buildings and structures on the Property[;]" and that, "[a]s a direct and proximate result of [their] negligence, the City has suffered and incurred, and will in the future suffer and incur damage[.]"

[5] In opposition to summary judgment, NKC provided deposition testimony of its senior building code inspector and affidavits from the engineer who submitted a report to NKC in 2014 and the community development director.

According to the inspector, such inspections are conducted only to verify whether the property in question is in violation based on the specific alleged complaint.

5

not be held liable for any defective conditions on the property. ADM also alleged that both claims brought by NKC were barred by the relevant statutes of limitations. The trial court granted summary judgment on both grounds. NKC appeals.

## II.      Standard of Review

"Summary judgment shall be entered if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 580 (Mo. banc 2006) (quoting Rule 74.04(c)(6)).[6] "Appellate review of summary judgment is essentially *de novo*." *Mo. Landowners All. v. Grain Belt Express Clean Line LLC*, 561 S.W.3d 39, 43-44 (Mo. App. W.D. 2018) (citing *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). We view the facts and any inferences "in the light most favorable to the party against whom judgment was entered[.]" *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 587 (Mo. banc 2013) (citing *Lewis v. Gilmore*, 366 S.W.3d 522, 524 (Mo. banc 2012)).

## III.      Discussion

NKC raises two points on appeal. In its first point, NKC alleges that the trial court erred in granting summary judgment in favor of ADM because there was a genuine issue of material fact regarding whether ADM had concealed the property's condition from Tauvar. In its second point,

---

The affidavit from the engineer stated that he could not make an accurate assessment of the property from a distance; that upon closer inspection of the exterior of the concrete storage bins and the interior and exterior of the metal silos, he was able to determine that "the buildings were a nuisance, in disrepair, and needed to be demolished[;]" and that "without proper access to the [p]roperty and special training, a lay person would not be able to make a determination concerning the condition of the property."

The affidavit from the community development director stated that "[t]he language of an Abatement Notice/Order labeling the [p]roperty as a nuisance is the standard language used by the City[;]" that abatement notices are "issued for specific violations on the [p]roperty, not to the [p]roperty as a whole[;]" and that "[t]o my knowledge, prior to the inspection which occurred on January 15, 2013, the City did not have sufficient information to determine the [p]roperty constituted a nuisance."

[6] Rule references are to the Missouri Supreme Court Rules (2016).

6

NKC claims that the trial court erred in granting summary judgment because there was a genuine issue of material fact concerning when the statute of limitations began to run on each claim alleged in its Petition. Because resolution of NKC's second point is dispositive, we address only it.

The expiration of the statute of limitations is an affirmative defense. Rule 55.08. "A party who moves for summary judgment on the basis of a statute of limitations bears the burden of showing that the statute bars the plaintiff's claims." *White v. Zubres*, 222 S.W.3d 272, 274 (Mo. banc 2007) (citing *Powel*, 197 S.W.3d at 580) (additional citations omitted). "But once the movant shows that the plaintiff's claim would be barred by the statute of limitations, the plaintiff bears the burden of showing that [it] comes within an exception in the statute so as to avoid the application of the limitations period to the claim." *Id*. (citation omitted). "[W]hen contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Giles v. Carmi Flavor & Fragrance Co., Inc.*, 475 S.W.3d 184, 194 (Mo. App. W.D. 2015) (*Powel*, 197 S.W.3d at 585). In order for a defendant who is seeking summary judgment based on a statute of limitations defense to prevail, there must be no genuine dispute over the facts required to support the defense. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376.

In this case, both parties agree that the applicable statute of limitations for a temporary, abatable nuisance is ten years.[7] *See Campbell v. Anderson*, 866 S.W.2d 139, 142 (Mo. App. W.D. 1993) (citing § 516.010, RSMo).[8] Both parties also agree that the applicable statute of limitations

---

[7] We note that "[t]he period of limitations as to a temporary nuisance [] runs anew from the accrual of injury from every successive invasion of interest." *Rebel v. Big Tarkio Drainage Dist. of Holt City*, 602 S.W.2d 787, 792 (Mo. App. W.D. 1980). In this appeal, NKC narrowly argues that a genuine issue of material fact exists relating to the timing of its discovery of the dangerous structures requiring demolition on the property. NKC does not argue that there was any new or "successive invasion of interest" involving this property subsequent to 2005 that might have started "anew" the statute of limitations. As a result of NKC's framing of the issue on appeal, we address this as a single "invasion of interest" temporary nuisance.

[8] Statutory citations are to the Missouri Revised Statutes (2000).

7

for negligence is five years. *See State ex rel. Heart of Am. Counsel v. McKenzie*, 484 S.W.3d 320, 324 (Mo. banc 2016) (citing § 516.120, RSMo). However, the parties dispute when the statute of limitations began to run on each of NKC's causes of action.

"To determine whether a statute of limitations bars recovery, it is necessary to establish when the cause of action accrued." *Boland v. Saint Luke's Health Sys., Inc.*, 471 S.W.3d 703, 710 (Mo. banc 2015) (citation omitted). "A cause of action accrues, and the limitations period begins to run, when the right to sue arises." *Id*. (citation omitted). "Accrual takes place not 'when the wrong is done or the technical breach . . . of duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment[.]" *Eckel v. Eckel*, 540 S.W.3d 476, 486 (Mo. App. W.D. 2018) (quoting § 516.100, RSMo). "In other words, 'a cause of action accrues when a plaintiff has some notice or awareness that he has suffered an injury or that another individual has committed a legal wrong which may result in harm to the plaintiff.'" *Id*. (quoting *Warren Cty. Concrete, L.L.C. v. People's Bank & Trust Co.*, 340 S.W.3d 289, 291 (Mo. App. E.D. 2011)). "Missouri uses a reasonable person standard: a wrong is capable of ascertainment when 'a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages.'" *Gerken v. Sherman*, 351 S.W.3d 1, 7 (Mo. App. W.D. 2011) (quoting *Powel*, 197 S.W.3d at 584-85).

NKC argues that it did not become aware of the dangerous condition of the structures at 1400 Nodaway until 2014 when it received a report from its engineer. ADM counters that NKC knew of the condition of the structures when it inspected or visited the property on nearly a dozen occasions between 2003 and 2005. After reviewing the record, we find the uncontroverted facts establish that NKC was aware of the dangerous condition of the structures on the property no later than 2005.

8

The nature and extent of NKC's actions with respect to the subject property from 2003 to 2005 is key to resolving the statute of limitations issue. NKC understandably attempts to minimize the breadth and scope of its inspections, notices of abatement, and other actions that occurred during that time period. However, NKC's effort to recast those actions—primarily through the prism of self-serving affidavits and deposition testimony—does not create a genuine issue of material fact.

For instance, NKC offered deposition testimony from its senior building code inspector that its efforts during the 2003 to 2005 period were narrowly tailored to only address the specifics of the dumping complaint. However, the actions taken by NKC beginning with its October 2003 inspection clearly extended beyond the dumping of salvage material and encompassed issues related to the safety and stability of the structures on the property. In fact, after that initial inspection, NKC condemned the property and ordered Tauvar to secure the structures within ten days and to submit a plan to repair or demolish the structures on the property within 30 days.

After another inspection in November 2003, NKC's senior building code inspector sent a memo to NKC's chief of police informing him of the condemnation based on the "generally dilapidated condition of all of the structures on the property." The inspector also informed the police chief that "[n]o person should be allowed to enter any of the buildings on the property[.]" Reports prepared by NKC in November 2003 further clarified that it intended for Tauvar to close and secure all of the structures on the property as part of the October 29, 2003, notice of abatement and condemnation. The notice of abatement, the memo to the police chief, and the reports confirm NKC's knowledge of the danger posed by the structures on the property and the need for them to be repaired or demolished.

9

NKC performed multiple other inspections and issued two additional notices of abatement involving the structures on the property over the next two years. NKC attempts to manufacture a genuine issue of material fact by dismissing those actions and arguing that it did not gain sufficient knowledge relating to the integrity of the structures to declare the property a public nuisance until it received an engineer's report in 2014.[9] This assertion, however, ignores that NKC issued notices of abatement in both 2004 and 2005 that specifically declared the property a "nuisance" based on "numerous safety violations" and ordered that the "[s]tructures and property shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public." In response, Tauvar indicated that he would begin "demolition of the facilities." No structures were demolished by Tauvar.

For reasons not explained, NKC did not follow up on its notices of abatement or on Tauvar's demolition plans until 2013, when it issued Tauvar a Notice of Violation/Order of Demolition.[10] NKC argues that a genuine issue of material fact exists because the demolition order issued in 2013 differed from the abatement notices issued between 2003 and 2005. While it is accurate that NKC did not require Tauvar to demolish all of the structures until 2013, the full extent of the damages need not be known in order for the statute of limitations to begin running. *See Grady v. Amrep, Inc.*, 139 S.W.3d 585, 588 (Mo. App. E.D. 2004) (citation omitted) (stating that "[d]amages are ascertained when the fact of damage appears rather than when the extent or amount of damage occurs."). As stated above, NKC knew that all of the structures on the property were

---

[9] NKC argues that it was the report from the engineer that provided it the necessary knowledge of the condition of the structures on the property to declare a public nuisance. However, notwithstanding the knowledge the city had acquired of the condition of the structures from its numerous inspections during the 2003 to 2005 timeframe, NKC's effort to establish the receipt of this report as a watershed moment is countermanded by the undisputed fact that it issued a demolition order directed at the structures on the property in January 2013, more than a year before it received the engineer's report.

[10] This delay occurred despite NKC's warning in the 2005 abatement notice that failure to bring the property into compliance with the city code would result in legal action.

dilapidated and dangerous in 2003 when it first issued a notice of abatement requiring Tauvar to repair or demolish the structures and condemned the property. NKC clearly possessed such knowledge no later than 2005 when it declared (for the second time) that the property was a nuisance. Acquisition of evidence *further* establishing the dangerous condition of the property does not serve to excuse (or explain) NKC's failure to take any action relating to this property between 2005 and 2013 or waiting until 2016 to bring this action.

The statute of limitations began to run on the nuisance claim when NKC was capable of ascertaining that the structures on the property constituted a public nuisance, specifically that they were in such a condition as to annoy, injure, endanger, render insecure, interfere with, or obstruct the rights or property of the whole community and substantially impair the common community rights including public health, safety, peace, and convenience. The uncontroverted facts established that this occurred no later than 2005 when NKC ordered Tauvar to repair or demolish and secure the structures, condemned the property, and declared the property a nuisance. This was more than ten years before NKC filed its petition against Tauvar and ADM in 2016.

The statute of limitations for the negligence claim, as it pertains to ADM, began running at the same time. NKC's petition alleged that ADM "failed to use a reasonable degree of care by repairing, maintaining, or demolishing the buildings and structures on the Property." Like the nuisance claim, the negligence claim accrued and the statute of limitations began to run when NKC developed knowledge that the structures on the property were "generally dilapidated" and needed to be repaired or demolished. This occurred no later than 2005. As a result, the negligence claim was filed more than five years after the cause of action accrued and it too was barred by the applicable statute of limitations.

Therefore, the trial court did not err in granting summary judgment against NKC on the basis that the statute of limitations had expired for both counts. Point II denied.

Because we find that NKC's lawsuit against ADM was barred by the statute of limitations, we need not consider NKC's first point on appeal.

### IV.     Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.